# IN THE SUPREME COURT OF TEXAS

═══════════

No. 15-0155

═══════════

ENDEAVOR ENERGY RESOURCES, L.P. AND ENDEAVOR PETROLEUM, L.L.C.,
PETITIONERS,

v.

DISCOVERY OPERATING, INC. AND PATRIOT ROYALTY AND LAND, L.L.C.,
RESPONDENTS

═══════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE ELEVENTH DISTRICT OF TEXAS

═══════════

**Argued January 9, 2018**

JUSTICE BOYD delivered the opinion of the Court.

This case involves competing claims to mineral-lease interests in two tracts of land in Martin County. Discovery Operating, Inc., which has drilled producing wells on both tracts, bases its claim on leases acquired directly from the mineral-estate owners. Endeavor Energy Resources, L.P., and Endeavor Petroleum, L.L.C., (collectively, Endeavor) bases its claim on prior leases with the same owners covering land that includes the two tracts at issue. Endeavor never drilled on those two tracts, and the parties agree that Endeavor's leases' terms have expired. But the leases include "retained-acreage clauses," which provide that the leases would continue after they expired as to a certain number of acres associated with each of the wells Endeavor drilled on adjacent tracts. The issue is whether the acreage Endeavor retained under the retained-acreage clauses

includes the two tracts at issue. The trial court and court of appeals held that it does not. We agree and affirm.

## I.
## Background

Between 2004 and 2007, Endeavor acquired mineral leases involving two adjoining tracts. The leases relevant to this dispute cover all (approximately 640 acres) of a tract we will call "section 4,"[1] and the northern half (approximately 320 acres) of a tract we will call "section 9."[2] Section 4 sits immediately north of section 9. Endeavor completed two wells in section 9, both located in the section's northeastern quarter (approximately 160 acres), which we will call well #1 and well #2. Although the lease covered the entire northern half of section 9, Endeavor did not drill in or develop section 9's northwestern quarter. Endeavor also completed two wells in section 4, both in that section's southeastern quarter (approximately 160 acres), which we will call well #3 and well #4. Although the lease covered all of section 4, Endeavor did not drill wells in section 4's southwestern quarter.

After completing the wells, Endeavor filed certified proration plats with the Texas Railroad Commission (the Commission). For well #1, the plat designated a proration unit of 81.21 acres consisting of the northern half of section 9's northeastern quarter. For well #2, the plat designated

---

[1] A "section" of land is a one-square-mile area containing 640 acres. *See* 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW: MANUAL OF OIL AND GAS TERMS 951 (LexisNexis Matthew Bender 2017) [hereinafter WILLIAMS & MEYERS].

[2] The Elrods, who own the mineral interests and were Endeavor's lessors as to section 4, include Stanley D. Elrod, Karen M. Thomas, Jon David Elrod, Janice K. Gaither, and Joseph Elrod. Section 4 is described more particularly as Section 4, Block 35, T–1–N, T & P Ry. Co. Survey, Martin County, Texas. Rebecca J. Williams, Norvella Ann Schafer, and Jackie Lue Wells are Trustees of The Mildred Haggard Irrevocable Grantor Trust, which owns the mineral interests and was Endeavor's lessor as to section 9. Section 9 is described more particularly as Section 9, Block 35, T–1–N, T & P Ry. Co. Survey, Martin County, Texas.

2

81.21 acres consisting of the southern half of section 9's northeastern quarter. The designated proration units did not include any of section 9's northwestern quarter:



Section 9

| | |
|---|---|
| | 81.21 acres • #1 |
| 162.41 acres | 81.21 acres • #2 |

▨ Proration Unit Assigned to Well #1
▦ Proration Unit Assigned to Well #2
☐ Undeveloped and Unassigned Section 9 Acreage

For well #3, Endeavor's plat designated 81.0 acres consisting of the northern half of section 4's southeastern quarter. For well #4, the plat designated 81.0 acres consisting of the southern half of section 4's southeastern quarter. The designated proration units did not include any of section 4's southwestern quarter:



Section 4

81.0 acres #3

161.99 acres

#4 81.0 acres

▨ Proration Unit Assigned to Well #3
▥ Proration Unit Assigned to Well #4
☐ Undeveloped and Unassigned Section 4 Acreage

The leases at issue include two clauses that permit Endeavor to retain certain interests after the leases' primary terms expire. The first, which we refer to as the continuous-development clause, provides that the leases "shall remain in full force and effect as to all proration units" after the primary terms expire if Endeavor, as the lessee or "operator," is "then engaged in drilling or reworking operations" and so long as Endeavor maintains "a continuous drilling program." If Endeavor is not engaged in such operations when the primary terms expire, the leases will automatically terminate "as to each proration unit" on which there is no well "producing oil or gas in commercial quantities." The second clause, which we refer to as the retained-acreage clause, provides that once the leases expire and the operator does not maintain the required continuous-

4

drilling program, the leases "shall automatically terminate as to all lands and depths covered herein, *save and except*" certain lands within certain governmental proration units "assigned to" a producing well. (Emphasis added.)

After Endeavor's leases' primary terms expired, Patriot Royalty and Land, LLC, reviewed the leases and the certified proration plats Endeavor had filed with the Commission. Based on those documents, Patriot concluded that Endeavor's leases had terminated as to section 4's southwestern quarter and section 9's northwestern quarter—the lands Endeavor did not include in the proration units designated in its filed plats and on which it had not engaged in any drilling or development operations. Patriot approached the owners of section 4 and section 9, obtained leases covering both of those quarters, and then assigned the leases to Discovery. Discovery successfully drilled two wells in each quarter.

When Endeavor discovered that Discovery had drilled wells on section 4's southwestern quarter and section 9's northwestern quarter, it objected to Discovery's assertion of any leasehold interest in those quarters. Relying on the leases' retained-acreage clauses, it asserted that the applicable governmental proration unit for each of its two wells in section 9's northeastern quarter covered 160 acres, and thus each proration unit included half of section 9's northwestern quarter as well as half of section 9's northeastern quarter. Endeavor also asserted that the applicable governmental proration unit for each of its two wells in section 4's southeastern quarter also covered 160 acres, and thus each proration unit included half of section 4's southwestern quarter as well as half of its southeastern quarter. In short, based on the retained-acreage clauses, Endeavor asserted that its leases remained in effect as to the entire southern half of section 4 and the entire northern half of section 9, so Discovery's leases were invalid.

5

As explained, however, Endeavor had previously filed plats with the Commission assigning proration units of only 81.21 or 81.0 acres to each of the four wells, and those proration units did not include the lands described in Discovery's leases (section 4's southwestern quarter and section 9's northwestern quarter). Endeavor asserted that it had mistakenly failed to assign 160 acres to each well, consistent with the applicable "governmental proration unit." Relying on this assertion, Endeavor filed new proration plats with the Commission, assigning 160 acres to each well, which included the acreage described in Discovery's leases.

Also relying on the retained-acreage clauses, Discovery asserted that the lands within the governmental proration units assigned to Endeavor's producing wells included only the 81.21 and 81.0 acres that Endeavor had assigned as proration units in its plat filings before the leases' primary terms expired. Relying on this construction of the retained-acreage clauses, Discovery filed this trespass-to-try-title action against Endeavor. The Elrods and the Haggard Trust intervened as plaintiffs in support of Discovery's position. Because of this litigation, the Commission declined to take any action with regard to Endeavor's request to amend its plat filings.

After stipulating to most of the relevant facts, both sides filed summary-judgment motions. Agreeing with Discovery's construction of the retained-acreage clauses, the trial court granted Discovery's motion and denied Endeavor's. In its order, the trial court held that (1) Endeavor's leases had terminated as to the disputed acreage, (2) Discovery's leases were valid, and (3) Discovery held record title to, ownership of, and the exclusive right to possession of the leasehold interests. The court of appeals affirmed, holding that Endeavor's leasehold interests survived only as to the acreage in the proration units it assigned to its wells in the plats it filed with the

6

Commission. 448 S.W.3d 169, 178 (Tex. App.—Eastland 2014). We granted Endeavor's petition for review.

## II.
## Mineral Leases

Endeavor's rights to the disputed acreage derive solely from its mineral leases from the Elrods and the Haggard Trust. Like all mineral leases, Endeavor's leases memorialize the parties' contractual agreements. But unlike many other types of contracts, mineral leases are subject to extensive governmental regulation. As a result, mineral leases often include particular types of terms and clauses through which the parties specify their respective rights in light of the regulatory context. Before addressing Endeavor's leases, we briefly describe the contractual nature of mineral leases, the regulatory context in which they exist, and the key terms they often include.

**A.     Contractual nature**

A mineral lease is a contract, and as such, its terms define the parties' respective rights and duties. *See Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex. 1981). As with contracts generally, the parties are free to decide their contract's terms, and the law's "strong public policy favoring freedom of contract" compels courts to "respect and enforce" the terms on which the parties have agreed. *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95 (Tex. 2011) ("As a fundamental matter, Texas law recognizes and protects a broad freedom of contract.").

The general principles that govern our construction of contracts also govern our construction of mineral leases. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (per curiam) ("An oil and gas lease is a contract, and its terms are interpreted as such."). We review

7

and construe mineral leases de novo, and our objective in doing so is "to ascertain the parties' intent as expressed within the lease's four corners." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)). We presume the parties intended every clause to have some effect, so we "examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent." *Id.* Because mineral leases transfer and affect title to real-property interests, however, they are subject to special construction rules that apply particularly to agreements governing property rights. *See generally* Bruce M. Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction*, 24 TEX. TECH L. REV. 1 (1993).

**B.     Regulatory context**

Although mineral leases are contracts, they are subject to legal and regulatory restrictions. As a result, "the rights of the contracting parties to an oil and gas lease will be subordinated to the regulatory authority of the State even though the contractual rights or obligations may be affected in so doing." *Gulf Oil Corp. v. Southland Royalty Co.*, 478 S.W.2d 583, 590 (Tex. Civ. App.—El Paso 1972), *aff'd*, 496 S.W.2d 547 (Tex. 1973). In particular, mineral leases are "subject to the state's police power to conserve and develop" the State's natural resources. *Seagull Energy E & P, Inc. v. R.R. Com'n*, 226 S.W.3d 383, 389 (Tex. 2007) (citing TEX. CONST. art XVI, § 59(a)).

Exercising that power, the State, through the Legislature, has delegated rule-making authority to the Commission "to further the state's goals of preventing waste and conserving natural resources." *Id.* (citing TEX. NAT. RES. CODE § 85.201). Under that authority, the Commission "has adopted general rules applicable throughout the State." *R.R. Com'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 70 (Tex. 2003). For example, the Commission has promulgated

statewide spacing rules imposing a minimum distance between wells, *see* 16 TEX. ADMIN. CODE § 3.37, as well as statewide rules relating to regulatory filings, well densities, and proration units, *see id.* § 3.38.

One of the many ways the Commission attempts to prevent waste and conserve mineral resources is by adopting specific "production allowables" based on "proration units" assigned to each well. "Production allowables refer to the maximum amount of hydrocarbons a well may recover as prescribed by the applicable field rules" and "are designed to limit production from a well in order to control the rate of production from the field." *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 634 (Tex. App.—Austin 2000, pet. denied); *see Victory Energy Corp. v. Oz Gas Corp.*, 461 S.W.3d 159, 164 n.3 (Tex. App.—El Paso 2014, pet. denied); 58 C.J.S. Mines and Minerals § 447. A proration unit is the "acreage assigned to a well for the purpose of assigning [production] allowables and allocating allowable production to the well." 16 TEX. ADMIN. CODE § 3.38(a)(3). Generally, "an operator must first designate [a well's] proration unit and the acreage assigned to it, then certify that the acreage is productive before receiving the well's production allowable." *Luecke*, 38 S.W.3d at 634.

The Commission's statewide rules typically require operators to designate a well's acreage and proration unit by filing certified plats and other forms, such as a "Form P–15."[3] *See, e.g.*, 16 TEX. ADMIN. CODE § 3.31(c)(1) (requiring gas-well operators to file a "certified plat showing the acreage assigned to the well for proration purposes"); *id.* § 3.40(a) (permitting operators to pool

---

[3] "A Form P–15 is the means by which an operator designates the configuration, size, and location of acreage attributable to a given well for purposes of obtaining a production allowable from the Railroad Commission." *XOG Operating, LLC v. Chesapeake Expl. Ltd. P'ship*, 480 S.W.3d 22, 25 (Tex. App.—Amarillo 2015), *aff'd*, No. 15-0935, — S.W.3d — (Tex. Apr. 13, 2018).

acreage to create "a drilling unit or proration unit by filing an original certified plat"); *id.* § 3.40(g); (permitting operators to "file proration unit plats for individual wells in a field"). Acreage assigned to a well "for allocation of allowables" may not be assigned to another well in the same field. *Id.* § 3.40(d) ("[S]uch duplicate assignment of acreage is not acceptable."). The Commission reviews the operator's filings to ensure they comply with applicable rules and generates a "maximum allowable for a well," which is "the largest allowable that can be assigned under applicable rules," *id.* § 3.31(g)(9), and it will not accept a proration plat that "shows acreage in the unit in excess of the maximum number of acres permitted by the field rules," *id.* § 3.31(c)(1).

The Commission's statewide rules, however, "cannot adequately address the widely varying conditions found in the thousands of oil and gas reservoirs in Texas." *WBD Oil & Gas Co.*, 104 S.W.3d at 70. To accommodate unique circumstances existing within particular production areas, the Commission adopts specific "field rules," which provide "detailed regulations for a specific field." *Id.* The Commission "has replaced the statewide rules with more specific field rules where necessary to prevent waste or confiscation." *Seagull Energy E & P*, 226 S.W.3d at 389 (footnotes and citations omitted).

### C.      Common mineral-lease terms

Although mineral owners and operators generally enjoy the freedom to contract as they wish, they must exercise that freedom within the limits of the Commission's statewide and field rules. As a result of this unique regulatory context, mineral leases often contain particular terms and clauses that other kinds of leases and contracts do not. The dispute in this case involves clauses that address the duration and expiration of Endeavor's mineral leases; specifically, the habendum

10

clause, the continuous-development clause, and the retained-acreage clause. We briefly discuss each in turn.

### 1. Habendum clause

Generally, a lease's habendum clause defines the duration of the mineral-lease estate. *Anadarko*, 94 S.W.3d at 554. The habendum clause typically divides a lease's duration into two parts: a primary term and a secondary term. *Id.* The primary term usually lasts for a fixed period of time stated in the lease, while the secondary term continues the lease after the primary term expires, for "as long thereafter as oil, gas or other mineral is produced." *Id.* Under this type of habendum clause, a lease may continue indefinitely "as long as oil or gas is produced," but will automatically terminate if actual production permanently ceases during the secondary term. *Id.* As long as one portion of the leased tract—even a small portion—is producing oil or gas, the lease will continue as to the entire tract, even if the operator elects not to develop other areas within the leased tract. *See Mathews v. Sun Oil Co.*, 425 S.W.2d 330, 333 (Tex. 1968).

Because a mineral lease is a creature of contract, parties may modify the effect of a habendum clause by including other provisions. *See Anadarko*, 94 S.W.3d at 554.[4] Lessors, of course, typically desire that the operator fully develop the lease and produce as much as possible to maximize the lessors' royalties. After all, "the dominant purpose of a lease is to discover and produce oil and gas . . . ." *Rogers v. Osborn*, 261 S.W.2d 311, 315 (Wilson, J., concurring). Thus, a "habendum-only" lease—under which the lessee's production on only a small portion may permit the lessee to retain its rights as to the entire leased tract—may conflict with the lessor's

---

[4] *See also Cmty. Bank of Raymore v. Chesapeake Expl., L.L.C.*, 416 S.W.3d 750, 755 (Tex. App.—El Paso 2013, no pet.) ("The habendum clause, however, also recognizes that this general principle is subject to modification by other contractual provisions in the lease, including the producing-acreage and continuous-development clauses.").

desire to seek full development given the operator's ability to hold the entire estate by drilling only a single producing well. *See Anadarko*, 94 S.W.3d at 554. But an operator may prefer to postpone drilling and production until, for example, the market for the minerals produces a greater financial return. Continuous-development and retained-acreage clauses serve to balance the interests of the lessor and lessee in this respect.

### 2. Continuous-development clauses

A continuous-development clause "permits a lease to be preserved under certain circumstances even though there is no production after the expiration of the primary term during *continuous* drilling operations, whether on the same or different wells." WILLIAMS & MEYERS at § 617. Generally, under these types of clauses, "if production results from the continuous prosecution of the very operations being engaged in by the lessees upon the expiration of the primary term, the lease is good." *Rogers*, 261 S.W.2d at 315. But the required development efforts must "be continuous with no gap." *Id.* (Wilson, J., concurring). If the efforts cease at any moment after the primary term, the lease typically terminates immediately and automatically.

### 3. Retained-acreage clauses

Continuous-development clauses often work in tandem with other clauses, including retained-acreage clauses. While a habendum clause generally extends the entire lease so long as some production is occurring on the lease, and a continuous-development clause further extends the entire lease so long as the operator remains engaged in the required development efforts, a retained-acreage clause typically divides the leased acreage such that production or development will preserve the lease only as to a specified portion of the leased acreage. *See* 3 WILLIAMS &

12

MEYERS at § 603.7. So if a lessor wants its entire leasehold acreage developed, it should include a retained acreage clause in its leases. *Id*.

Retained-acreage clauses come in many different shapes, sizes, and forms.[5] The effect of a particular retained-acreage clause depends on the terms the parties freely chose and, like the Commission's implementation of special field rules, there is no "one size fits all" result of their proper construction. Each retained-acreage clause must be construed on its own, under governing principles of contract interpretation.

Although "originally drafted to prevent the lessee from losing those portions of a lease that had productive wells located thereon if the rest of the lease terminated," retained-acreage clauses have expanded to "include clauses that require the release of all acreage that, at the end of the primary term, is not within a drilling, spacing, or proration unit." Bruce M. Kramer, *Oil and Gas Leases and Pooling: A Look Back and a Peek Ahead*, 45 TEX. TECH L. REV. 877, 881 n.28 (2013). As a result, retained-acreage clauses often "refer to [Commission] proration units as the lodestar for determining which acreage has been obtained and which acreage must be surrendered." WILLIAMS & MEYERS at § 603.7. Defining the retained acreage by reference to a Commission designation like a proration unit can provide certainty or clarity regarding the extent of the acreage that remains under lease. But the inclusion of such regulatory principles in a retained-acreage

---

[5] *See, e.g.*, No. 15-0935, slip op. at 2 (clause reserved "portion of said lease *included within* the proration or pooled unit of each well") (emphasis added); *ConocoPhillips Co. v. Vaquillas Unproven Minerals, Ltd.*, No. 04-15-00066-CV, 2015 WL 4638272, at *1 (Tex. App.—San Antonio Aug. 5, 2015, pet. granted, judgm't vacated w.r.m.) (mem. op.) (clause reserved 640 acres unless a Commission rule "*provide[d]* for a spacing or proration establishing different units of acreage per well") (emphasis added); *Chesapeake Expl., L.L.C. v. Energen Res. Corp.*, 445 S.W.3d 878, 883 (Tex. App.—El Paso 2014, no pet.) (clause provided lease would terminate except as to each proration unit "*established* under the rules and regulations" of the Commission and "upon which there exists (either on the above described land or on lands pooled or unitized therewith) a well capable of producing oil and/or gas in commercial quantities") (emphasis added). By contrast, the retained-acreage clauses at issue here reserved acreage "assigned to" a particular well.

clause may also cause confusion or disappointment, as the contracting parties may not fully understand the ramifications of including a regulatory term in the typical mineral lease. *See ConocoPhillips*, 2015 WL 4638272, at *2 ("[W]hen a lease ties the retained acreage clause to governmental authority, the parties may not 'fully anticipate the consequences of doing so.'") (quoting Scott C. Petry, *Drafting the Retained Acreage Clause: The Effect of Governmental Authority on Retained Acreage*, STATE BAR. OF TEX. PROF. DEV. PROGRAM, 27TH ANNUAL ADVANCED OIL, GAS, AND ENERGY RESOURCES LAW COURSE 3 (2009) [hereinafter Petry].[6] This is such a case. With these principles in mind, we turn to Endeavor's leases.

### III.
### Endeavor's Mineral Leases

Endeavor's mineral leases were located in the Spraberry (Trend) Area, a massive oil field in the Permian Basin. Although the field's low porosity hindered initial efforts to recover the minerals underneath,[7] the advent of new technology has increased production significantly.[8]

A.    **Regulatory context**

The Commission has promulgated field rules specific to the Spraberry Trend Area, and those rules have changed over time. In 1952, for example, the Commission increased the allowable size of proration units from 80 acres to 160 acres per producing well, though the standard unit

---

[6] *See also Jones v. Killingsworth*, 403 S.W.2d 325, 328 (Tex. 1965) ("The fact that the [Commission] may Permit a much larger unit cannot be read into the lease contract when, as here, the authority to create larger units is expressly limited to units of the size Prescribed by the [Commission].").

[7] *'Largest uneconomic pay in the world' proved worth effort*, MIDLAND REPORTER-TELEGRAM (Sept. 26, 2009, 7:00 PM), http://www.mrt.com/business/energy/article/Largest-uneconomic-pay-in-world-proved-worth-7491811.php ("The expectation of a low recovery efficiency led many explorationists to call the sands the largest uneconomic oil-producing pay in the world.").

[8] Mella McEwen, *USGS assessment puts Spraberry resources at 4.2 billion barrels*, MIDLAND REPORTER-TELEGRAM (May 22, 2017, 12:24 PM), https://www.mrt.com/business/oil/article/USGS-assessment-puts-Spraberry-resources-at-4-2-11156810.php.

remained 80 acres. Tex. R.R. Com'n, *Special Order Adopting Rules and Regulations for the Spraberry Trend Area Field*, Oil & Gas Docket Nos. 125 & 126, 7 & 8–25,841 (Dec. 22, 1952). And since at least 1952, the Commission has required operators, "for proration purposes," to "file certified plats of their properties in the field, which plats show all those things pertinent to the determination of the acreage claimed for each well hereunder." *Id.*

The Commission amended the Spraberry rules in 2008, clarifying the permissible size of standard proration units, and also adopting specific rules for the assignment of "tolerance" acreage:

> The acreage assigned to an individual well shall be known as a proration unit. The standard drilling and proration units are established hereby to be EIGHTY (80) acres. No proration unit shall consist of more than EIGHTY (80) acres except as hereinafter provided. The two farthermost points in any proration unit shall not be in excess of THREE THOUSAND (3,000) feet removed from each other; provided however, that in the case of long and narrow leases or in cases where because of the shape of the lease such is necessary to permit the utilization of tolerance acreage, the Commission may after proper showing grant exceptions to the limitations as to the shape of proration units as herein contained. All proration units shall consist of continuous and contiguous acreage which can reasonably be considered to be productive of oil. No double assignment of acreage will be accepted.
>
> Notwithstanding the above, operators may elect to assign a tolerance of not more than EIGHTY (80) acres of additional unassigned lease acreage to a well on an EIGHTY (80) acre unit and shall in such event receive allowable credit for not more than ONE HUNDRED SIXTY (160) acres.
>
> Operators shall file with the Commission certified plats of their properties in said field, which plats shall set out distinctly all of those things pertinent to the determination of the acreage credit claimed for each well . . . .

Tex. R.R. Comm'n, *Final Order Amending Field Rule Nos. 2 and 3 in the Spraberry (Trend Area) Field Various Counties, Texas*, Oil and Gas Docket No. 08-0259977 (Dec. 16, 2008). After the 2008 amendment, the Spraberry field rules still required operators to file certified plats describing their proration units. *See id.*

15

**B.     Lease language**

The leases at issue here contain both continuous-development and retained-acreage clauses. The continuous-development clauses provide that the leases

> shall automatically terminate as to each proration unit upon which there is no well or wells thereon located and then producing oil or gas in commercial quantities unless Lessee is then engaged in drilling or reworking operations in accordance with the other provisions hereto. In the event Lessee is engaged in drilling or reworking operations at the expiration of the Primary Term, this lease shall remain in full force and effect as to all proration units so long as a continuous drilling program is maintained whereby not more than one-hundred twenty (120) days shall elapse from the completion of one well to the commencement of another well until all proration units are tested.

Each lease's retained-acreage clause identifies the acreage retained by referring to the Commission's regulatory concepts of proration units and allowables. Specifically, the clauses provide that, at the end of the leases' primary term or "upon the cessation of the continuous development . . . whichever is later," the

> lease shall automatically terminate as to all lands and depths covered herein, *save and except* those lands and depths located within a *governmental proration unit assigned to a well* producing oil or gas in paying quantities and the depths down to and including one hundred feet (100') below the deepest productive perforation(s), with each such governmental proration unit to contain the number of acres required to comply with the applicable rules and regulations of the Railroad Commission of Texas for *obtaining the maximum producing allowable* for the particular well. [Emphases added]

The parties do not dispute that the continuous-development period for section 9 ended on February 9, 2008, 120 days after Endeavor completed well #2, or that section 4's continuous-development period ended on February 5, 2009, 120 days after Endeavor completed well #4. Under the retained-acreage clauses, these dates capture at a particular moment in time the amount of acreage Endeavor stood to retain upon the clauses' triggering event.

16

The retained-acreage clauses also specify the acreage excepted from termination. Specifically, the leases do not terminate as to all "lands and depths located within a governmental proration unit assigned to a well producing oil or gas in paying quantities." The clauses provide further that each such proration unit must "contain the number of acres required to comply with the applicable rules and regulations of the Railroad Commission of Texas for obtaining the maximum producing allowable for the particular well." Thus, Endeavor retained acreage consisting of the governmental proration unit "assigned to" each well, and any such unit must contain the amount of acreage required to comply with the applicable Commission rules for obtaining the "maximum producing allowable" for the particular well.

The parties' dispute over the meaning of this clause focuses primarily on the phrases "proration unit assigned to a well" and "maximum producing allowable for the particular well." When Endeavor filed its plats with the Commission, it assigned 81.21 acres as the proration unit for each of the wells in section 9 and 81.0 acres for each of the wells in section 4. But Endeavor contends that it retained rights to proration units of 160 acres for each well because the Commission rules allow for a maximum total of 160 acres including the tolerance acres, and that is the amount of acreage that would result in the "maximum" allowable under the Commission's rules. Like the trial court and the court of appeals, we disagree.

### 1.     "Proration unit assigned to a well"

Endeavor contends that the clauses' reference to a proration unit "assigned to" a well is ambiguous because it does not identify *whose* assignment controls. Specifically, Endeavor argues that, although we could reasonably construe the phrase to refer to the 81-acre proration units *Endeavor* "assigned to" the wells in the plats it filed with the Commission, we can also reasonably

17

construe it to refer to the proration units *the Commission* has "assigned to" the wells through its special field rules. The court of appeals disagreed and held that the clause unambiguously refers to Endeavor's assignments because the Commission's rules required Endeavor, as the operator, to assign acreage to its proration units.[9]

"Deciding whether a contract is ambiguous is a question of law for the court." *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). In construing an oil and gas lease, our primary goal is to determine the parties' intent as expressed by the lease's plain language. *Id.* To do this, we "'construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper.'" *Id.* (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)). Of course, no ambiguity exists if the contract's language can be given a "definite or certain" meaning. *Id.* (quoting *Plains Expl.*, 473 S.W.3d at 305). Conversely, "a contract is ambiguous if it is susceptible to more than one reasonable interpretation." *Id.* (citation omitted). "An ambiguity, however, does not arise 'merely because parties to an agreement proffer different interpretations of a term.'" *Id.* (quoting *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)). For there to be an ambiguity, both parties' interpretations "must be *reasonable*." *Id.* (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).

---

[9] 448 S.W.3d at 177 ("[W]e conclude that the parties intended for the Endeavor Leases to terminate as to acreage that was not included in a governmental proration unit assigned to a well *by Endeavor* in a certified proration plat filed with the [Commission].") (emphasis added).

18

Discovery cites a number of authorities for the proposition that operators, and only operators, "assign" acreage to proration units, pointing to various Commission regulations, cases, and examples from practitioners. We agree with Discovery that the leases' reference to "assigned" proration units is unambiguous because the only reasonable construction of that reference is to *the operator's* assignment of a proration unit through its filing of a proration plat with the Commission. Within the regulatory context in which these leases exist, their references to acres "assigned to . . . proration units" must necessarily be construed in light of the Commission's rules as the standards governing the parties' contractual agreement. And as we have explained, both the Commission's statewide and field rules recognize that the operator is responsible for "assigning" acreage to a proration unit through its regulatory filings. As Discovery notes in its brief, Texas courts have consistently recognized that operators, and not the Commission, "assign" acreage to a proration unit.[10]

Endeavor's argument that the Commission could be the "assignor" is not reasonable because the Commission does not "assign" acreage to proration units—it merely quantifies the

___

[10] *See Broussard v. Texaco, Inc.*, 479 S.W.2d 270, 271–72 (Tex. 1972) (noting operators "assigned" 296.79 acres out of a 476 acre lease to proration units, leaving "179.21 producing acres . . . unassigned"); *Corzelius v. Harrell*, 186 S.W.2d 961, 971 (Tex. 1945) (observing that field rules required operator to file plat "showing the acreage to be assigned to each well, [the] proven productive acreage, and the dimensions of the unit on which each gas well is located"); *Unit Petroleum Co. v. David Pond Well Serv., Inc.*, 439 S.W.3d 389, 396 (Tex. App.—Amarillo 2014, pet. denied) (holding leasehold-interest owner has an "exclusive executive right to establish a proration unit encompassing any part of its leasehold estate"); *Luecke*, 38 S.W.3d at 634 ("[A]n operator must . . . designate the proration unit and the acreage assigned to it . . . ."); *Verble v. Coffman*, 680 S.W.2d 69, 70 (Tex. App.—Austin 1984, no writ) (operator "assigned an 80 acre proration unit for the well"); *May v. Cities Serv. Oil Co.*, 444 S.W.2d 822, 823 (Tex. Civ. App.—Beaumont 1969, writ ref'd n.r.e.) ("[T]he operator assigned acreage . . . to the production allowable unit."); *Expando Prod. Co. v. Marshall*, 407 S.W.2d 254, 256 (Tex. Civ. App.—Fort Worth 1966, writ ref'd n.r.e.) (noting "acreage assigned" to well's unit by the operator); *see also* 16 TEX. ADMIN. CODE § 3.86(g)(4) (requiring operators to file a "proration plat" that "depict[s] the lease . . . showing the acreage assigned to the proration unit for the . . . well"); *id.* § 3.40(a) (noting that operators "creat[e] a . . . proration unit by filing an original certified plat"); *id.* § 3.40(d) (prohibiting operators from "assign[ing]" acreage to a well's "proration unit" that has already been "assign[ed]" to another well's unit).

19

amount of acreage an operator assigns. Consistent with its statewide rules, the Commission's special field rules for the Spraberry Trend provide that operators "shall file with the Commission certified plats of their properties in said field, which plats shall set out distinctly all of those things pertinent to the determination of the acreage credit claimed for each well." Tex. R.R. Comm'n, *Final Order Amending Field Rule Nos. 2 and 3 in the Spraberry (Trend Area) Field Various Counties, Texas*, Oil and Gas Docket No. 08-0259977 (Dec. 16, 2008).

Indeed, the Commission reviews an operator's filings to determine whether the operator's assignment conflicts with the Commission's prohibition against the double-assignment of acreage or the over-assignment or under-assignment of acreage based on the applicable field rules. *See* 16 TEX. ADMIN. CODE § 3.40(d) ("[A]creage assigned to a well for drilling and development, or for allocation of allowable, shall not be assigned to any other well or wells completed or projected to be completed in the same field . . ."). As the Commission has explained in its amicus brief in this case, if the operator's assignment of acreage complies with the rules, the Commission will input that acreage into a well-tracking system, and it becomes "the lawfully assigned proration acreage for purposes of the [Commission's] records." The Commission then "automatically generate[s] a maximum allowable for that particular well pursuant to" the applicable proration formula. This is a well-established practice. *See, e.g.*, *Luecke*, 38 S.W.3d at 634 ("Thus, an *operator* must first designate the proration unit and the acreage assigned to it, then certify that the acreage is productive before receiving the well's production allowable.") (emphasis added).

20

Indeed, the numerous amici[11] who filed briefs in this case nearly all agree that the operator, not the Commission, "assigns" lands to proration units.

We conclude that the leases' use of "assigned" is unambiguous, and refers to the lessee's assignment of acreage through its regulatory filings. Nevertheless, Endeavor argues that we cannot reasonably read the leases to make its leasehold interest dependent upon its regulatory filings because the Commission uses proration records not to determine title but simply to assess a proper amount of allowables. Stated differently, Endeavor contends that a court cannot use regulatory filings as a basis for changing title. While we agree that the Commission "is a conservation body and does not have jurisdiction to effect a change of property rights," *Elliott v. Davis*, 553 S.W.2d 223, 227 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.), Endeavor's argument ignores the contractual nature of its leasehold interest and the regulatory context in which it exists. Although the Commission does not unilaterally determine title by approving or accepting an operator's assigned proration unit, the parties are free to agree that the operator's leasehold interest will survive and continue only to the extent of that assignment.

That is exactly what the parties did here. The retained-acreage clauses that govern Endeavor's rights following the expiration of the leases' primary terms unambiguously provides that those rights extend only to a proration unit "assigned to" a well, and within this regulatory context that can only refer to the operator's assignment. The operator's assignment affects the operator's leasehold interest because Endeavor's contractual agreement, made within the context of the Commission's applicable rules, requires that result. Endeavor's leases designated the

---

[11] Amici include the Permian Basin Petroleum Association, the Texas Independent Producers and Royalty Owners' Association, Pennington Resources, LLC, Redwood Exploration Company, LLC, Tyner Energy, LP, the Railroad Commission, the Texas Oil and Gas Association, and Browning Oil Company, Inc.

amount of retained acreage as the amount in the proration unit assigned to the wells per the Commission's rules. And consistent with the Commission's rules, Endeavor assigned a specific amount of acreage to the proration units for the wells at issue in this case by filing certified proration plats. We hold that under the leases' unambiguous language, those assignments govern the leasehold interests Endeavor retained.

### 2. "Obtaining the maximum producing allowable"

Endeavor argues, however, that its retained acreage includes 160 acres per well because the leases provide that "each [assigned] governmental proration unit" must "contain the number of acres required to comply with" the Commission's rules for obtaining "the maximum producing allowable for the particular well." Endeavor contends that, regardless of the meaning of the "assigned to" clause, the "maximum producing allowable" clause makes clear that Endeavor's retained proration units must consist of 160 acres, rather than the 81.21 and 81.0 acres it actually (but mistakenly) assigned to its wells.

More specifically, Endeavor argues that the leases' references to "maximum producing allowable" means that each proration unit *automatically* consists of the greatest amount of acreage the Commission's rules permit an operator to assign, because that amount will result in the "maximum producing allowable." As described above, the Commission's special rules for the Spraberry Trend provide for a "standard drilling and proration unit" of 80 acres, but allow operators to "elect to assign a tolerance of not more than" 80 additional acres and thereby "receive allowable credit for not more than" 160 acres.[12] According to Endeavor, it retained 160 acres per

---

[12] The Commission's statewide rules define "tolerance acreage" as "[a]creage within a lease, pooled unit, or unitized tract that may be assigned to a well for proration purposes pursuant to special field rules in addition to the amount established for a prescribed or optional proration unit." 16 TEX. ADMIN. CODE § 3.38(a)(6).

well because that is the amount that would result in the "maximum producing allowable" under the Commission's rules.

Discovery, on the other hand, contends that the retained-acreage clauses require the operator to file a plat assigning *only* the amount of acreage *necessary* to obtain the maximum producing allowable as determined by the applicable field rules for the particular well at issue. According to Discovery, Endeavor required only 80 acres per well to obtain the maximum producing allowable for each of its wells. The court of appeals agreed with Discovery, holding that the parties intended this clause "to define the amount of acres that Endeavor was to include in the governmental proration units that it assigned in its certified proration plats filed with the [Commission]." 448 S.W.3d at 178.

We agree with Discovery. We construe the retained-acreage clauses as requiring Endeavor to include in its certified plats only "the number of acres required to comply with the applicable rules and regulations of [Commission] for obtaining the maximum producing allowable for the particular well." If Endeavor's regulatory filings included an amount sufficient to obtain the maximum producing allowable, then that amount—however small it might be—would be excepted from termination under the retained-acreage clauses.

Under the special field rules, the maximum producing allowable for Endeavor's wells depends in part on the amount of acreage it assigned to each well. Rule 4 provides that the maximum producing allowable for a well on an 80-acre proration unit is 515 barrels per day.[13]

---

[13] The actual maximum producing allowable for Endeavor's wells is determined by an equation set out in Spraberry (Trend) Area Rule 4:

RULE 4: The maximum daily oil allowable for each well on an EIGHTY (80) unit in the subject field shall be 515 barrels of oil per day, and the actual allowable for an individual well shall be determined by the sum total of the two following two values:

23

Thus, the smallest amount of acreage that an operator can assign and remain in compliance with the applicable field rules is 80 acres, and the maximum producing allowable under that assignment is 515 barrels. If production exceeds that amount, this clause requires the operator to assign additional acreage—tolerance acreage—to each well if the operator desires to increase the maximum production allowable for each well. Thus, if Endeavor included in its certified plats the minimum amount of acreage sufficient to comply with the Commission's rules for obtaining the maximum producing allowable for each of its wells, that is the amount it stood to retain upon the retained-acreage clauses' triggering event.

Endeavor assigned roughly 81 acres to each of its wells. It is undisputed, however, that Endeavor's wells could not achieve the maximum producing allowable for that amount of acreage under Rule 4. In fact, when this dispute arose, the Commission's hearings examiner acknowledged that "the 81.0 acre allowables will allow the wells to produce an amount of oil far in excess of the amount of oil the wells are currently capable of producing." Thus, Endeavor assigned to each of its wells an amount of acreage that "compl[ied] with the applicable rules and regulations of the [Commission] for obtaining the maximum producing allowable for the particular well." Having met the threshold requirement for compliance with the field rules, Endeavor retained exactly what

1. Each well shall be assigned an allowable equal to the top allowable established for a well having a proration unit containing the maximum acreage authorized exclusive of tolerance acreage multiplied by SEVENTY FIVE percent (75%) and by then multiplying this value by that fraction the numerator of which is the acreage assigned to the well and the denominator of which is the maximum acreage authorized for a proration unit exclusive of tolerance acreage.

2. Each well shall be assigned an allowable equal to TWENTY FIVE percent (25%) of the maximum daily oil allowable above.

Tex. R.R. Comm'n, *Final Order Amending Field Rule 4 in the Spraberry (Trend Area) Field Various Counties, Texas*, Oil and Gas Docket No. 7C-0258301 (Jan. 15, 2009).

it bargained for: approximately 81 acres per well. Under the leases' unambiguous language, all unassigned acreage reverted to the lessors.

To retain 160 acres per well, Endeavor needed to *actually* assign 160 acres to each well. Rule 3 provides that Endeavor could have attempted to assign to each of its existing proration units an additional 80 acres of "tolerance acreage." Although such an assignment would hypothetically raise each well's maximum producing allowable, when productive acreage is a component of the maximum producing allowable—as it is here—the operator must "verify[] that additional acreage is actually necessary or required to achieve the maximum allowable." Philip C. Mani, *Interpreting and Drafting Retained Acreage Provisions—Partial Termination of Leasehold Rights*, STATE BAR OF TEX. OIL, GAS, & MINERAL TITLE EXAMINATION COURSE, at 6 (2015). Indeed, if a well "is draining a certain amount of acreage, but the operator intends to claim more than that amount, the operator may open itself up to claims that it is not acting in good faith in purporting to retain a substantially greater amount of acreage." *Id.*; *see also* Petry at 4 ("If the technical evidence clearly show that the well is draining eighty (80) acres, but the client operator is claiming three hundred twenty (320) acres under the maximum allowable, that client may open itself up to claims that it did not act in good faith in retaining the full 320 acres."). Of course, this question is not directly before us, as Endeavor did not assign *any* tolerance acreage to its proration units.

In summary, Endeavor's retained-acreage clauses provided that its leases would automatically terminate except for lands "located within a governmental proration unit assigned to a well . . . with each such governmental proration unit to contain the number of acres required to comply with the applicable rules and regulations of the [Commission] for obtaining the maximum producing allowable for the particular well." The applicable field rules required

25

Endeavor to "file with the Commission certified plats of their properties," and for those plats to "set out distinctly all of those things pertinent to the determination of the acreage credit claimed for each well." Endeavor assigned 81-acre proration units to each of its producing wells, as depicted in the certified plats it filed with the Commission. Thus, at the clauses' triggering event—the end of each lease's continuous-development period—Endeavor retained only the acreage it had assigned to each well. That amount was 81 acres—not 160 acres. Consequently, Endeavor's leases terminated as to the acreage that Discovery's leases cover, which Endeavor did not assign to a producing well.

## C. Other construction rules

Endeavor argues that two additional rules of construction require the conclusion that it retained its lease as to 160 acres per well. Again, we do not agree.

### 1. Forfeiture

Endeavor contends that the court of appeals' construction of its leases' retained-acreage clauses violates the "rule against forfeiture" because it "divest[ed] Endeavor of 320 acres of productive property, and did so without compensation." Although we have noted that "[f]orfeitures are not favored in Texas, and contracts are construed to avoid them," *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239 (Tex. 2016) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009)), we agree with the court of appeals that its construction does not result in forfeiture, but rather a partial termination of the leases under their own terms. This result arises from the fact that the retained-acreage clauses operate as special limitations on Endeavor's

leasehold interests.[14]

A special limitation in an oil and gas lease provides that the lease will automatically terminate upon the happening of a stipulated event. This event may be the cessation of production in contravention of the lease's terms,[15] failure to commence drilling or reworking operations within the time the lease required,[16] or an operator's failure to timely pay a shut-in royalty the lease required.[17] And although whether a lease has terminated "'is always a question of resolving the intention of the parties from the entire instrument,'" we will not find a special limitation "unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Anadarko*, 94 S.W.3d at 554 (quoting *Fox. v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)).

The plain, grammatical language of Endeavor's leases shows that the parties intended the leases to continue only as to acreage that had been assigned to a well as reflected in the certified plats Endeavor filed with the Commission, and that the leases "shall automatically terminate" as to all acreage not assigned to those proration units. This is precisely the type of clear and unequivocal language that imposes a special limitation on a lease. Here, the leases required

---

[14] Forfeitures, which generally arise from the failure to comply with a condition subsequent, cut short the natural limit of the leasehold interest. A.W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 8 TEX. L. REV. 483, 486 (1930) ("A condition subsequent is a forfeiture provision; it renders the estate liable to be defeated by the happening of the event expressed in the condition prior to the normal termination of the estate."). By contrast, a special limitation "does not operate to cut short the estate but simply fixes one of the natural limits of the estate beyond which the estate cannot endure, being similar in this respect to a general limitation, and, like a clause of general limitation, is in no proper sense a forfeiture provision." *Id.* (footnote omitted).

[15] *See Freeman v. Magnolia Petroleum Co.*, 171 S.W.2d 339, 342 (Tex. 1943) ("Here the parties agreed that if no gas was being produced on April 7, 1940, the lease should terminate.").

[16] *See Samano v. Sun Oil Co.*, 621 S.W.2d 580, 584 (Tex. 1981) ("When production stopped on May 4, 1977, during the secondary period, Sun had an express sixty days to drill or rework the well. When it failed to do so, the lease by its express terms automatically terminated.").

[17] *See id.* at 583–85.

Endeavor to either (1) continue developing the tracts at issue, or (2) by the end of the continuous-development period, assign sufficient acreage to the wells' respective proration units to achieve the maximum producing allowable for those wells. Because Endeavor did not assign the undeveloped acreage to a proration unit, Endeavor's leases automatically terminated as to those lands. Lessees who agree to leases like those at issue here must meet "the condition which they imposed upon themselves . . . . For their failure to do so they have only themselves to blame." *Freeman*, 171 S.W.2d at 342.

### 2. Construed as a whole

Finally, Endeavor argues that only its construction is consistent with the rest of the contract. Specifically, Endeavor notes that the leases' continuous-development clauses use the term "proration unit" to refer to a part of the lease "even if it had no well." Yet Discovery construes "assigned to," as used in the retained-acreage clause, to refer to the proration unit the operator assigns to a specific well. Endeavor contends that, because the term must bear the same meaning in both clauses, the term "assigned" as used in the retained-acreage clause must refer to what the Commission assigns, not what the operator assigns. We disagree.

The continuous-development clauses provide that the leases will terminate "as to each proration unit upon which there is no well or wells thereon located and then producing oil or gas in commercial quantities." We do not agree that this clause suggests that a proration unit can exist where "there is no well." Rather, it refers to a proration unit upon which there is no well that is both (1) located on the proration unit, "and" (2) producing oil or gas in commercial quantities when the termination occurs. "'And' is a conjunction that means 'along with or together with.'" *Harkins*, 501 S.W.3d at 604 (quoting *And*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY

28

80 (2002)). Given the retained-acreage clauses' identical requirement that proration units contain a producing well, we agree with Discovery's interpretation.

## IV.
## Conclusion

We conclude that the retained-acreage clauses in the leases at issue permitted Endeavor to retain the amount of acreage Endeavor "assigned to" each well in the plats it filed with the Commission. Thus, we affirm the court of appeals' judgment.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: April 13, 2018