COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| HJSA NO. 3, LP, | § | |
| Appellant, | § | No. 08-18-00113-CV |
| v. | § | Appeal from the |
| SUNDOWN ENERGY LP; SMC 2000 LP; PGP HOLDINGS 1, LLC; SMITH | § | 143rd District Court |
| ALLEN OIL & GAS, LLP; TRANSMOUNTAIN EXPLORATION | § | of Ward County, Texas |
| LLC; FORTUNE NATURAL RESOURCES CORP.; TEXAS HEAT OF | § | (TC# 16-05-23886-CV) |
| THE PERMIAN BASIN, INC; WHITING OIL & GAS CORP.; ODYSSEY | § | |
| ROYALITIES LLC; HORIZON ROYALITIES LLC; PINECONE | § | |
| RESOURCES LLC; BRENDA DORMAN FAUGHT; and LENA RENEE | § | |
| BRIGMAN, | § | |
| Appellees. | § | |

## DISSENTING OPINION

The central issue of this appeal questions whether Lessee Sundown and its co-Appellees (collectively, "Lessees" or "Sundown") met an obligation to engage in a continuous drilling program, as prescribed by lease terms, sufficient to delay a reassignment of non-producing tracts back to Lessor HJSA No. 3, L.P. ("Lessor" or "HJSA"). The trial court granted partial summary judgment in favor of Sundown after determining that Sundown's operations of reworking and

reconditioning of existing wells satisfied the range of operations permitted by lease terms. In reversing the trial court's ruling, the majority imposes a specific requirement on Sundown—that is, to spud-in a continuous development well within 120 days of completion or abandonment of a prior well—to satisfy the drilling program requirements. Because the majority reads a more specific requirement into the continuous drilling program than expressly stated by the unambiguous lease, I respectfully dissent.

## DISCUSSION

### *Lease Construction and the Four-Corners Rule*

Although the parties do not agree about the proper construction of the lease, both assert the lease is unambiguous. Ambiguity does not arise merely because the parties assert differing interpretations. *N. Shore Energy, LLC v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016); *Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 904 (Tex. 2016) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). The proper construction of an unambiguous lease is a question of law determined de novo. *Samson Explor., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 787 (Tex. 2017); *Anadarko Petrol. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002).

The rules and principles generally used in interpreting contracts are also used in the construction of mineral leases. *Endeavor Energy Res., LP v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). Absent ambiguity, our primary duty is "to ascertain the intent of the parties from all of the language within the four corners of the deed." *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017) (citing *Luckel v. White*, 819 S.W.2d 459, 462 (Tex. 1991)). The starting point for contract construction is necessarily its express language. *Murphy Explor. &*

2

*Prod. Co.—USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018)). "We give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions." *Apache Deepwater, LLC v. Double Eagle Dev., LLC*, 557 S.W.3d 650, 654 (Tex.App.—El Paso 2017, pet. denied). "We presume the parties intended every clause to have some effect, so we 'examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent.'" *Endeavor Energy*, 554 S.W.3d at 595 (quoting *Anadarko Petrol.*, 94 S.W.3d at 554). In interpreting a lease according to its express language, we may not read more stringent requirements into the lease than those the parties intended. *Murphy Explor.*, 560 S.W.3d at 113 (proximity requirement in offset provision not permitted where it deviates from the language the parties chose); *Luckel*, 819 S.W.2d at 463 (recognizing that courts may not interpolate or substitute in such a way as to change the clear and unambiguous meaning of a lease clause). "When terms in a contract are defined, those definitions control the interpretation of the agreement." *Sloane II v. Goldberg B'nai B'rith Towers*, ____ S.W.3d____, No. 14-17-00557-CV, 2019 WL 2000484, *6 (Tex.App.—Houston [14th Dist.] May 7, 2019, no pet. h.)(citing *Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211 (Tex. 2003).[1]

Texas has long recognized a strong public policy favoring the freedom to contract, and we are compelled to "respect and enforce" parties' agreements. *Endeavor Energy*, 554 S.W.3d at 595 (citing *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)); *see Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019)(parties' valid limitation-of-liability clause limited recovery to $2.6 million in actual damages and negated $5.3

---

[1] "It is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 228 (2012).

million in punitive damages, even though petitioner's conduct was reprehensible). "Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered[.]" *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017). As such, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy. *Id.* at 481.

Having laid this legal framework, I turn now to the lease terms at issue.

*Analysis*

Paragraph 7(a) provides that the lease would continue for so long as Lessee produced oil and gas from the leased premises in paying quantities subject to the reassignment provisions set forth in later provisions. Paragraph 7(a) next identifies requirements imposed as divided between two periods of time. From the effective date of the lease until the sixth anniversary of that date, production in paying quantities from anywhere on the leased premises expressly extended the entire lease without any reassignment obligation. After the sixth anniversary and subject to paragraph 7(b), the lease imposes on Lessee an obligation to reassign operating rights in all tracts of the leased premises not then held by production.

This reassignment obligation is delayed, however, for so long as the Lessee is engaged in a continuous drilling program as principally described in paragraph 7(b). Having now exceeded the sixth anniversary, the parties dispute the nature of the requirements imposed by the continuous drilling program. Based on the parties' dispute, a closer look at the language of paragraph 7(b) is warranted.

The first sentence of 7(b) states:

[7](b). The obligation in Paragraph 7(a) above to reassign tracts not held by production shall be delayed for so long as Lessee is engaged in a continuous drilling

4

program on that part of the Leased Premises outside of the Producing Areas.

Simply stated, this first sentence introduces the requirement to engage in a "continuous drilling program" on the portion of the leased premises "outside of the Producing Areas." Within the phrase "continuous drilling program," the combined term "continuous drilling" operates as an adjectival phrase modifying the noun "program." As commonly defined, the term "continuous" means "marked by uninterrupted extension in space, time, or sequence." *Continuous*, Merriam Webster's Collegiate Dictionary (10th ed. 1997). From this description of the program, the parties plainly intended drilling activity, at a minimum, that is uninterrupted in space, time, or sequence.

Following this introductory statement, the second sentence of 7(b) further describes the nature of the program's requirements. It reads:

> The first such continuous development well shall be spudded-in on or before the sixth anniversary of the Effective Date, with no more than 120 days to elapse between completion or abandonment of operations on one well and commencement of drilling operations on the next ensuing well.

Most noteworthy, the term "drilling operations," appearing near the end of this second sentence, is a specifically defined term contained in a later provision of the lease. Because we presume the parties intended every clause to have some effect, we must examine the entire lease and attempt to harmonize all its parts. *Endeavor Energy*, 554 S.W.3d at 594. Moving beyond paragraph 7(b), the definition included in paragraph 18 provides as follows:

18. DRILLING OPERATIONS DEFINED

> Whenever used in this lease the term **'drilling operations'** shall mean: actual operations for drilling, testing, completing and equipping a well (spud in with equipment capable of drilling to Lessee's object depth); reworking operations, including fracturing and acidizing; and reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well. [Emphasis added].

As commonly defined, the term "whenever," appearing at the beginning of this clause,

5

means "at any or every time that." *Whenever*, Merriam Webster's Collegiate Dictionary (10th ed. 1997). Second, the term "shall," which also appears in the first phrase, is recognized by statute as imposing a mandatory duty when it is included in statutory language. TEX.GOV'T CODE ANN. § 311.016(2); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001). Given the mandatory instruction appearing in this phrase, a plain reading of the lease requires that the definition of "drilling operations" must be incorporated into paragraph 7(b). Such incorporation thereby harmonizes the two clauses as required by these lease terms. Bringing paragraph 18 closer to paragraph 7(b), these provisions as shown below encompass the operational details of the continuous drilling program, on premises outside of the producing areas, that is required for Lessees to maintain operating rights:

> [7](b) The obligation . . . to reassign tracts . . . shall be delayed for so long as Lessee is engaged in a continuous drilling program on that part of the Leased Premises outside of the Producing Areas. The first such continuous development well shall be spudded-in on or before the sixth anniversary of the Effective Date, with no more than 120 days to elapse between completion or abandonment of operations on one well and commencement of drilling operations on the next ensuing well.

.         .         .

### 18. DRILLING OPERATIONS DEFINED

> Whenever used in this lease the term 'drilling operations' shall mean: actual operations for drilling, testing, completing and equipping a well (spud in with equipment capable of drilling to Lessee's object depth); reworking operations, including fracturing and acidizing; and reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well.

Focusing more closely on the details of the program, the second sentence of 7(b) contains three noteworthy elements which I have numbered below for ease of discussion:

> [7(b)] [1] The first such continuous development well [2] shall be spudded-in on or before the sixth anniversary of the Effective Date, [3] with no more than 120 days to elapse between completion or abandonment of operations on one well and

6

commencement of drilling operations on the next ensuing well.

First, the sentence begins with the noun phrase, "the first such continuous development well." Because this mention of "the first such continuous development well" follows immediately after the earlier reference to a continuous drilling program, this term provides further details about how the drilling program begins. This phrase alone, however, contains three sub-elements.

The term "first," plainly indicates the initial starting point of the required drilling program. The next term "such," is used to modify the noun phrase "continuous development well," that immediately follows. "Such" is commonly defined as "of the same class, type, or sort." *Such*, Merriam Webster's Collegiate Dictionary (10th ed. 1997). By its placement, "such" is being used to link the noun phrase, "continuous development well," with the earlier phrase, "continuous drilling program." In linking these phrases, "such" is placed in an intermediary position to indicate that the first development well belongs to the continuous drilling program being of the same class, type, or of sort. Bringing in the third sub-element, the term "continuous development" is a compound adjective that modifies the noun "well." In total, the phrase, "first such continuous development well" refers to the first well belonging to the "continuous drilling program." In short, the well that is being described is not merely a continuous well, nor is it simply a development well; rather it is a continuous-development well, i.e., a well that is part of the continuous-drilling program.

After describing the first well, the second element of the sentence prescribes the action required of Lessee regarding the first well within the context of the program. With mandatory language, the lease requires that the first well "shall be spudded-in on or before the sixth anniversary of the Effective Date . . . ." As recognized by the majority, the term "spudded-in" is

a term of art in the oil and gas industry that describes "[t]he first boring of the hole in the drilling of an oil well." *See* P. Martin and B. Kramer, *Williams & Meyers - Manual of Oil and Gas Terms*, 1007 (16th ed. 2015). Before the sixth anniversary of the effective date, the continuous drilling program requires that Lessee "spud-in" the first well on the premises outside the producing areas.

After the initial drilling or "first boring," the third element of the sentence imposes both a time requirement and an operational detail that further defines the continuous nature of the program. The third element reads, "with no more than 120 days to elapse between completion or abandonment of operations on one well and commencement of drilling operations on the next ensuing well." By focusing on this phrase, I arrive at the height of the dispute between the parties and between this panel—namely, the nature and extent of the obligation required of Lessee as pertaining to ensuing wells beyond the spudding-in of the first well. Adopting the position advanced by Lessors, the majority concludes that Lessee is obligated to not only spud-in the first well but also to continue spudding-in each ensuing well of the program within the required timeframe to maintain operating rights. Parting ways with the majority, I agree with the ruling of the trial court and would instead incorporate the full definition of "drilling operations" provided in paragraph 18 as the operative requirement imposed on ensuing wells beyond the first. *See Endeavor Energy*, 554 S.W.3d at 594.

Substituting the definition of "drilling operations" directly into this last phrase of the sentence, as required by paragraph 18, I would find that the plain reading of the lease requires the following:

> [W]ith no more than 120 days to elapse between completion or abandonment of operations on one well and commencement of [*actual operations for drilling, testing, completing and equipping a well (spud in with equipment capable of drilling to Lessee's object depth); reworking operations, including fracturing and*

8

*acidizing; and reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well*] on the next ensuing well. [Emphasis added].

With this substitution, a plain reading shows that a range of activities far beyond mere spudding-in is permitted for Lessee to maintain operating rights over the leased premises. When broken out into its three internal phrases, "drilling operations," as defined by the parties themselves, includes a range of activities permitted for ensuing wells as follows:

(1) actual operations for drilling, testing, completing and equipping a well (spud in with equipment capable of drilling to Lessee's object depth);

(2) reworking operations, including fracturing and acidizing; and,

(3) reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well.

With its summary judgment evidence, Lessee asserted that they had conducted such "drilling operations," as defined by the lease, without more than a 120 days lapse of operations on the contested acreage for over sixteen years. These operations include investment of more than forty million dollars in operating on the contested acreage. Given that these facts are not in dispute, the trial court found that Sundown had timely conducted such drilling operations without a lapse of 120 days between completion of one drilling operation and the commencement of the next drilling operation on the contested part of the leased premises. Because the definition of "drilling operations" includes operations conducted by Lessee, I would give full effect to the definition provided in paragraph 18 when determining whether Lessee has in fact complied with requirements of the continuous drilling program. *See Endeavor Energy*, 554 S.W.3d at 594; *see also Sloane II*, 2019 WL 2000484, at *6 (citing *Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211 (Tex. 2003). From a plain reading of the lease, I would conclude that the parties intended to incorporate the definition of "drilling operations" as provided in paragraph 18 into the

9

requirements of the continuous drilling program as set out in 7(b). *See Endeavor Energy*, 554 S.W.3d at 594.

In contrast, the majority concludes that paragraphs 7(b) and 18 are in conflict due to 7(b) requiring "spudding-in" of the first well and on the next ensuing well despite the definition of drilling operations provided in paragraph 18. The majority reasons that, "[i]f the parties had desired only a single well to be spudded-in, and to then allow drilling operations on any well to maintain the lease, as Sundown claims, they would not have used next ensuing well in the context of the first and subsequent 'continuous drilling well.'" By this interpretation, the majority concludes that paragraph 7(b) provides a specific provision that controls over the general provision included in paragraph 18. Because the term "drilling operations" appears elsewhere in the lease, the majority concludes that paragraph 18 is not rendered meaningless when excluded from 7(b), but instead, will be applied "elsewhere in the contract in different contexts."

In my view, the majority's interpretation not only alters the plain reading of the lease as more fully explained above, but also this interpretation demands a spudding-in for every well beyond the first one in conflict with the range of operations permitted by the agreement of the parties as evidenced by the broad definition included for "drilling operations." *See Murphy Exploration & Production Company—USA v. Adams*, 560 S.W.3d 105, 113 (Tex. 2018)(courts should not read into a lease more stringent obligations than the parties intend). Where parties to a contract expressly define a contractual term, the parties' agreed definition must prevail over other definitions. *Provident Life*, 128 S.W.3d at 219; *Sloane II*, 2019 WL 2000484, at *6; Scalia, *Reading Law* 184. Because I disagree, I dissent from the majority, and instead, I would affirm the trial court's ruling.

10

August 16, 2019

GINA M. PALAFOX, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.
Palafox, J., Dissenting

11