

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-20-00089-CV

**VERMILLION FC, LP**,
Appellant

v.

**1776 ENERGY PARTNERS, LLC**,
Appellee

From the 293rd Judicial District Court, Zavala County, Texas
Trial Court No. 16-10-13812-ZCV
Honorable Donna S. Rayes, Judge Presiding[1]

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Rebeca C. Martinez, Chief Justice
               Luz Elena D. Chapa, Justice
               Lori I. Valenzuela, Justice

Delivered and Filed: August 25, 2021

AFFIRMED IN PART, REVERSED AND REMANDED IN PART

This is an appeal from a final judgment rendered by the trial court in 1776 Energy Partners, LLC's favor, dismissing Vermillion FC, LP's claims related to the retention of certain acreage under the parties' oil and gas lease. We affirm in part and reverse and remand in part.

---

[1] Senior Judge, sitting by assignment

**BACKGROUND**

The parties entered into an oil and gas lease conveying mineral rights to approximately 1,100 acres in Zavala County, Texas in 2010.[2] 1776 Energy commenced drilling operations in 2011 on a horizontal oil well—the Byrd Ranch No. 1H Well—and the well began production in August 2011. The lease established that after a three-year primary term that expired on July 20, 2013, only acreage designated as a part of a well tract would remain subject to the lease unless 1776 Energy exercised a two-year option by paying an option fee to extend the lease as to acreage outside the tract. On June 7, 2013, 1776 Energy filed a well tract for the well, designating 320 acres and eleven days later provided lessors notice of the tract. The parties spent the following three years disputing whether 1776 Energy breached the lease's terms by, among other things, retaining excess acreage in the well tract and untimely filing a partial release of non-retained acreage under the lease, more than two years after 1776 Energy was supposed to file it as provided by the lease.

Vermillion filed suit in October 2016 for several breaches of contract and certain other ancillary claims.[3] After the parties conducted discovery, Vermillion moved for partial summary judgment on traditional grounds, arguing that the 320-acre well tract designated by 1776 Energy should have been 40 acres and that the lease terminated as to all other acreage. Around the same time, 1776 Energy moved for summary judgment on traditional and no-evidence grounds.[4] The

---

[2] Vermillion and JLP Force Majeure Limited Partnership are successors-in-interest to lessors James Gates Byrd, Joseph Patrick Byrd, and Elizabeth Byrd Parks, and 1776 Energy is a successor-in-interest to lessee Riley-Huff Energy Group, LLC. JLP was Vermillion's co-plaintiff in the lawsuit, but it did not join Vermillion in this appeal.

[3] Vermillion's ancillary claims are: declaratory judgment, unjust enrichment, suit to quiet title, conversion, common law trespass, trespass to try title, loss of business opportunity, slander of title, "breach of duty and implied covenants," and bad faith.

[4] At the same time, 1776 Energy also moved for summary judgment on statute of limitations grounds with respect to all of Vermillion's claims, which the trial court denied.

court denied 1776 Energy's motions and granted Vermillion's motion in 2018 without specifying the grounds.

1776 Energy filed an omnibus motion for reconsideration of the trial court's orders on the parties' 2018 cross-motions for summary judgment solely with respect to Vermillion's breach of contract claims.[5] At the same time, the parties also filed cross-motions for summary judgment on traditional grounds on Vermillion's breach of contract claim on the lease's option fee and release in sections 2.B. and 10.[6] The trial court granted 1776 Energy's omnibus motion by denying Vermillion's motion for partial summary judgment on traditional grounds and granting 1776 Energy's amended motion for summary judgment on traditional and no evidence grounds. The trial court also denied Vermillion's motion for summary judgment on the option fee and release, granted 1776 Energy's motion for summary judgment as to the same, and rendered "all claims and causes of action" in the parties' live pleadings "fully and finally adjudicated."[7]

Vermillion timely appealed.

### FINALITY OF AMENDED FINAL JUDGMENT

Vermillion argues it sued 1776 Energy on its ancillary claims, and 1776 Energy moved for reconsideration of only the breach of contract claims; the appeal is therefore interlocutory, and the case below may proceed as to the remaining claims regardless of the outcome of this appeal. Vermillion is correct that 1776 Energy's omnibus motion for reconsideration did not address its non-contractual claims. However, the amended final judgment disposed of all of Vermillion's claims in the action when the trial court: (1) granted 1776 Energy's 2018 traditional and no

---

[5] The motion for reconsideration was 1776 Energy's second motion for reconsideration.

[6] "Section 2.B." is actually "paragraph 2.B." However, because the lease's paragraphs often internally contain more than one paragraph, we refer to them as "sections."

[7] The judgment also severed the breach of contract on "paying quantities" claim and attorney's fees and included a handful of evidentiary rulings. Neither party challenges the evidentiary rulings on appeal, and the excluded items are not dispositive to this appeal.

evidence amended motions for summary judgment; (2) granted 1776 Energy's motion for summary judgment on the option fee; (3) severed the claims related to the cross-motions for summary judgment on the breach of contract for paying quantities claim and attorney's fees; and (4) further provided "all claims and causes of action in Defendant's Third Amended Answer and Original Counterclaims and in Vermillion's Eighth Amended Original Petition, both of which are the parties' respective live pleadings, are fully and finally adjudicated."[8] The trial court therefore rendered judgment for 1776 Energy and dismissed all claims and counterclaims in the suit making the judgment final and appealable. *See In re Elizondo*, 544 S.W.3d 824, 827-29 (Tex. 2018) (orig. proceeding) (per curiam). Vermillion did not raise that issue while the trial court maintained plenary power, and it is therefore not preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1); *In re Elizondo*, 544 S.W.3d at 829.

### SUMMARY JUDGMENT RULINGS

#### A. Standard of Review

Vermillion argues the trial court erred by granting 1776 Energy's traditional and no-evidence motions for summary judgment and denying its partial motion for summary judgment. We review summary judgments de novo. *Carrera v. Yañez*, 491 S.W.3d 90, 93 (Tex. App.—San Antonio 2016, no pet.). If the trial court does not specify the grounds for its ruling, we must affirm summary judgment if any of the grounds on which judgment was sought are meritorious. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). "If a trial court grants a motion for summary judgment that includes both traditional and no evidence grounds, we evaluate the no evidence grounds first." *Carrera*, 491 S.W.3d at 94.

---

[8] The Court also provided "the orders granted herein constitute a full and final determination of all live controversies in this matter" and "[t]his is a final judgment appealable as allowed by law. All claims against all parties in this matter have been adjudicated in full."

**B. 1776 Energy's No-Evidence Motion for Summary Judgment**

1776 Energy moved for summary judgment on no-evidence grounds. It argued Vermillion failed to show any damages related to (1) the untimely well-tract designation contract claim under section 6.B.; (2) the partial release contract claim; and (3) exemplary damages.[9] On reconsideration, the trial court granted the no-evidence motion without identifying the grounds for the court's decision.

"A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial and the nonmovant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements." *Id.* at 93-94 (internal quotation marks omitted). "In reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the non-movant's favor." *Id.* at 94. "If the nonmovant fails to meet its no evidence burden on any given claim, we need not analyze whether the movant satisfied its burden under the traditional motion." *Id.*

1776 Energy argued that Vermillion had no damages with respect to the untimely well-tract designation because it filed the well-tract designation in Zavala County in June 2013—during the lease's primary term when 1776 Energy still controlled the entirety of the leased premises. With respect to the partial release, 1776 Energy argued that despite filing the partial release in June

---

[9] Vermillion identifies section 10 of the lease in its Petition as the basis for its so-called "partial release" claim based on 1776 Energy's delay in providing a partial release. The partial release, which is attached to the Petition, shows 1776 Energy relied on section 18 when it partially released certain acreage. Sections 10 and 18 include substantially identical language requiring 1776 Energy to provide a release upon the expiration or termination of the lease as to any acreage covered under the lease within 90 days of said release. For simplicity, the remainder of the opinion refers to the claim as the "partial release" claim.

2015—nearly two years after it should have been filed in October 2013—Vermillion had no evidence of any damages for the late filing.

To prevail on a breach of contract claim, a plaintiff must establish it was damaged by the breach. *See Graves v. Logan*, 404 S.W.3d 582, 584 (Tex. App.—Houston [1st Dist.] 2010, no pet.). In opposition to the no-evidence motion, Vermillion produced no evidence of damages with respect to the untimely well-tract designation. With respect to the partial release, its only basis for damages was a June 2016 offer to lease its property made by Sanchez Oil & Gas Corporation—an offer made a year after the partial release. However, the 2016 offer letter makes plain that Vermillion could *not* accept the offer without first rejecting its own position that 1776 Energy was entitled to retain 40 acres under the lease and materially breaching the lease because the offer was contingent on the release of "*any* acreage presently ascribed to the Byrd Ranch No. 1H Well." (emphasis added)

A party seeking exemplary damages must prove "by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE § 41.003. Vermillion argues it sent multiple letters to 1776 Energy stating 1776 Energy violated the lease, it was aware it violated the lease, and this constitutes "gross negligence, malice, or fraud as it relates to its obligation to release acreage under the Lease." Even assuming 1776 Energy knowingly breached the lease, mere breach of contract does not constitute a basis for exemplary damages. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

Because Vermillion has failed to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact, we cannot conclude the trial court erred in

granting 1776 Energy's no-evidence motion for summary judgment on the untimely well-tract designation, the partial release claims, or exemplary damages.[10]

## C. The Cross-Motions on the Well-Tract Provision

The central issue in the parties' dispute involves the well tract designation, and some contextual background may prove helpful. Oil and gas leases are subject to certain legal and regulatory restrictions not found in other contracts. *See Endeavor Energy Res., L.P. v. Discovery Op., Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). As a result, party rights under a lease are subordinated to the regulatory authority, which the state exercises through the Texas Railroad Commission (RRC). *Id.* Generally, the RRC promulgates statewide spacing rules imposing a minimum distance between wells to prevent wasting and conserve mineral resources. *Id.* at 595-96. Well spacing is dependent on operators/lessees assigning acreage to wells in proration units. *Id.* at 596. A proration unit is the acreage assigned to a well for the purpose of assigning and allocating production allowables to the well. *Id.*; *see* 16 Tex. ADMIN. CODE § 3.38(a)(3). The RRC adopts what are known as "production allowables" based on these proration units. *Endeavor*, 554 S.W.3d at 596. Production allowables are "the maximum amount of hydrocarbons a well may recover as prescribed by the applicable field rules and are designed to limit production from a well in order to control the rate of production from the field." *Id.* (internal quotation marks omitted). A well's production allowables are provided by the RRC after an operator certifies a proration unit is

---

[10] 1776 Energy also moved for reconsideration by arguing it was entitled to summary judgment on traditional grounds on Vermillion's untimely well-tract designation claim. Vermillion argued in opposition, and for the first time on appeal, that its untimely well-tract designation and partial release contract claims were actually continuing contract claims and, as a result, its refusal to accept 1776 Energy's repudiation of the continuing contract tolled the accrual of any statute of limitations, making its continuing contract claims timely. Because we conclude the trial court properly granted 1776 Energy summary judgment on no-evidence grounds on the untimely well-tract designation and partial release claims, we need not consider these grounds. *See Carrera*, 491 S.W.3d at 94 ("If the nonmovant fails to meet its no evidence burden on any given claim, we need not analyze whether the movant satisfied its burden under the traditional motion."); *see also* TEX. R. APP. P. 33.1(a)(1).

productive.[11] *Id.* Proration unit regulation often occurs in various production areas through field rules. Field rules are rules adopted by the RRC detailing specific regulations for specific production areas across the state to "accommodate unique circumstances existing within particular production areas." *Id.*

"As a result of this unique regulatory context, mineral leases often contain particular terms and clauses that other kinds of leases and contracts do not." *Id.* at 596-97. The dispute between the parties here involves one such type of clause—a retained-acreage clause identified as a "well tract" clause in section 6.A. of the lease. *Id.* at 598. A retained-acreage clause typically divides the leased acreage in two parts such that hydrocarbon production or development will preserve the lease's primary term from expiring only as to a specified portion of the leased acreage surrounding a well and nothing else. *Id.* In other words, a retained-acreage clause will continue the lease only as to the acreage assigned to a productive well. *Id.* A retained acreage clause uses various terms and "must be construed on its own, under governing principles of contract interpretation." *Id.* Retained-acreage clauses often use proration units as the lodestar for determining what acreage is retained by the operator and what acreage is released. *Id.* However, including proration units in a lease "may also cause confusion or disappointment, as the contracting parties may not fully understand the ramifications of including [such] a regulatory term." *Id.*

Here, turning to the well-tract provision in the lease, Vermillion argues the provision required the well tract to have as few acres as possible for actual production, and further argued this is supported by the Texas Supreme Court's construction of a retained acreage clause and its relationship with RRC rules in *Endeavor*. The parties filed cross-motions on whether 1776 Energy

---

[11] The Commission's statewide rules typically require operators to designate a well's acreage and proration unit by filing certified plats and other forms, such as a Form P–15, indicating the acreage and containing certified plats showing the size and acreage assigned to a well or wells. *Id.*

breached the lease by allegedly including more acreage in the well-tract designation than allowed under the lease.

As previously mentioned, the trial court on reconsideration granted summary judgment for 1776 Energy but did not identify the grounds for the motion. When both sides move for summary judgment on the same issue and the trial court grants one motion and denies the other, we review all the summary judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered. *City of San Antonio v. Int'l Ass'n of Fire Fighters, Local 624*, 582 S.W.3d 455, 460 (Tex. App.—San Antonio 2018, no pet.).

### 1. Lease Construction

The parties agree the retained-acreage provision in section 6.A. is unambiguous but dispute its meaning. "In construing an unambiguous lease, our primary duty is to ascertain the parties' intent as expressed within the lease's four corners." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). In reviewing the lease, we read all parts of the lease together to harmonize and give effect to all the provisions so no provision is rendered meaningless, and we use the lease language's plain, grammatical meaning unless doing so would clearly defeat the parties' intentions. *Id.* (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)); *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019).

The clause at issue identifies how the lessee should determine the size of the well tract surrounding the Byrd Ranch No. 1H Well—a horizontal drainhole well and the only well drilled in connection with the approximately 1,100-acre lease:

> 6. A. **Well Tract**. A "Well Tract" shall be that tract around each Oil or Gas well, which shall be the minimum number of acres surrounding each Oil or Gas well then producing in Paying Quantities, which pursuant to the applicable field rules the appropriate State agency provides or permits for creation of an allowable sufficient to cover actual production, which shall never exceed eighty (80) acres plus the length of the horizontal well bore plus 330 feet on either side thereof. If the [RRC] rules will permit a fort[y] (40) acres spacing, forty (40) acres shall be used. Where

the appropriate State agency permits multiple optional proration unit sizes, or where multiple proration unit sizes are prescribed, Lessee shall designate the smallest proration unit size surrounding each such Oil or Gas well located on the Leased Premises which is necessary for the creation of an allowable sufficient to cover actual production. In the event that multiple proration sizes become permitted after the creation of any Well Tract, then that Well Tract shall be reduced to the smallest proration unit size which is necessary for the creation of an allowable sufficient to cover current actual production.

. . .

**Notwithstanding the above, in the event any governmental authority having jurisdiction should hereafter establish a density or spacing pattern of a different number of acres around oil and/or gas wells for full allowable purposes than the number of acres specified above, then lessee may only retain around each oil well and each gas well such number of acres as necessary to allow maximum production.**[12]

. . .

Section 6.A.'s first sentence defines the well tract as the "minimum number of acres" producing in "paying quantities"—which the lease defines in section 5.E. as producing "more than an average of three (3) barrels of oil a day for three (3) consecutive calendar months." This is modified by the remainder of the sentence which explains that this minimum number of acres is subject to the allowables sufficient to cover actual production under applicable field rules. The clause is further modified by the express limitation of 80 acres "plus the length of the horizontal well bore plus 330 feet on either side thereof." Taken together, the first sentence provides the well tract shall be the minimum number of acres producing in paying quantities, subject to applicable field rules for proration units and production allowables, but the maximum acreage is 80 acres plus the length of the horizontal well bore plus 330 feet on either side. The following three sentences speak for themselves: 40 acres should be used if permitted under the RRC rules, but if multiple

---

[12] This paragraph is in all capital letters in the lease.

proration unit sizes are recommended under the RRC rules, 1776 Energy should use the smallest proration unit permitted to create the well tract.

The second paragraph in section 6.A. begins with a "notwithstanding the above" clause, which "contemplate[s] the possibility that other parts of [the provision] may conflict [with it], and they agree that this paragraph must be given effect." *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2005, no pet.). It provides if the government establishes a density or spacing pattern of a different number of acres for allowables from the above, then 1776 Energy may retain the number of acres for such production allowables. Therefore, the well tract shall be the minimum number of acres producing in paying quantities, subject to applicable field rules and never more than 80 acres plus the length of the horizontal well bore plus 330 feet on either side. However, if the applicable field rules establish a number different from the above, then 1776 Energy may retain the number of acres established by the field rules.

The well became productive in August 2011 and the following year became subject to the RRC's permanent field rules for the production area.[13] Rule 3 of the field rules provides, in pertinent part:

> . . . The standard drilling and proration units are established hereby to be EIGHTY (80) acres. . . . Additional acreage may be assigned to each horizontal drainhole well in accordance with Statewide Rule 86.

> If after the drilling of the last well on any lease and the assignment of acreage to each well thereon . . . there remains an additional unassigned acreage of less than EIGHTY (80) acres, then and in such event the remaining unassigned acreage up to and including a total of FORTY (40) acres may be assigned as tolerance acreage to the last well drilled on such lease . . . .

---

[13] R.R. COMM'N OF TEX., ORDER NUNC PRO TUNC AMENDING AND MAKING PERMANENT THE FIELD RULES FOR THE EAGLEVILLE (EAGLE FORD-1) FIELD ATASCOSA, DIMMIT, GONZALES, LA SALLE, MCMULLEN, WILSON AND ZAVALA COUNTIES, TEX.

An operator, at his option, shall be permitted to form optional drilling units of FORTY (40) acres. A proportional acreage allowable credit will be given for a well on a fractional proration unit.

. . .

The first paragraph establishes that proration units shall consist of 80 acres, but additional acreage may be assigned to each horizontal drainhole well in accordance with Statewide Rule 86. Rule 86 regulates horizontal drainhole wells, including drainhole spacing, well densities, and proration and drilling units. 16 TEX. ADMIN. CODE § 3.86. A "horizontal drainhole" is "[t]hat portion of the wellbore drilled in the correlative interval, between the penetration point and the terminus." *Id.* The rule permits greater acreage assigned to a horizontal drainhole well than a vertical well by providing that acreage may be assigned to the horizontal well "up to the amount specified by applicable rules for a proration unit for a vertical well plus the additional acreage assignment as provided in this paragraph." The paragraph has an additional acreage assignments chart for fields with a density rule of greater than 40 acres that specifies additional acreage as follows:

| Horizontal Drainhole Displacement, ft | Additional Acreage Allowed, acres |
| --- | --- |
| 150 to 827 | 40 |
| 828 to 1,654 | 80 |
| 1,655 to 2,481 | 120 |
| 2,482 to 3,308 | 160 |
| 3,309 to 4,135 | 200 |
| 4,136 to 4,962 | 240 |
| etc. – 827 ft increments | etc. – 40 acre increments |

The rule therefore allows a lessee or operator to assign additional acreage based upon the horizontal drainhole *displacement*. *Id.* § 3.86(a)(3). "Horizontal drainhole displacement" is "the calculated horizontal displacement of the horizontal drainhole from the first take point to the last

take point." *Id.* § 3.86(a)(4). "[T]he length or displacement of a horizontal drainhole controls the maximum acreage that may be assigned to its proration unit: the longer the horizontal drainhole, the more acreage assigned to the unit. It is not uncommon for horizontal drainholes to extend up to 5000 feet." *See Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 636 (Tex. App—Austin 2000, pet. denied).

The second paragraph in Rule 3 provides that if after drilling the last well on any lease and after acreage has been assigned in accordance with RRC regulations, "there remains an additional unassigned acreage of *less than EIGHTY (80) ACRES*," then 40 acres "may be assigned as tolerance acreage to the last well drilled on such lease." (emphasis added). Rule 3's next paragraph states: An operator, at his option, shall be permitted to form optional drilling units of FORTY (40) acres. For instance, if a lone horizontal well is drilled in connection with a 1,000-acre lease, and it has a 2,000 foot drainhole displacement with field rules adopting 80-acre proration units permitting additional acreage pursuant to Rule 86, and there are no optional drilling units, then the lessee/operator may assign to the well the 80 acres plus as much as 120 additional acres, for a 200-acre total. It may not assign any tolerance acreage because additional unassigned acreage would total more than 80 acres.

The summary judgment evidence in the record shows the field rules established 80-acre proration units with additional acreage assignable based on the horizontal drainhole displacement. 1776 Energy measured the distance from the first take point to the last take point in the horizontal drainhole as 3,962 feet. Based on the Rule 86 chart above, it was entitled to an additional 200 acres. 1776 Energy drilled no other well on the leased acreage. As a result, the additional unassigned acreage under the lease was not less than 80 acres, and the tolerance acreage provision is not applicable to the well. 1776 Energy identifies no optional drilling units. 1776 Energy was therefore entitled to retain 280 acres under the RRC's rules. Because 280 acres is more than 80

acres plus the length of the horizontal well bore plus 330 feet on either side, the notwithstanding paragraph controls and 1776 Energy is entitled to retain 280 acres with respect to the well—not 40 acres as Vermillion argues or 320 acres as 1776 Energy argues.

According to Vermillion, the well-tract provision's first four sentences plainly provide an intent to minimize retained acreage and restrict it to 40 acres per well, and the notwithstanding paragraph referred to applicable RRC rules establishing 80-acre proration units that must be productive, but do not allow "aspirational" well tracts. We agree with Vermillion's interpretation as to the first four sentences. The notwithstanding paragraph in section 6.A., however, plainly states that to the extent the RRC's field rules provide for additional acreage, the RRC rules control. Here, the RRC field rules provide for additional acreage, and therefore control.

### 2. *Endeavor* and *XOG*

The well-tract provision is distinguishable from the retained-acreage clauses in *Endeavor Energy Res., L.P. v. Discovery Op., Inc.*, 554 S.W.3d 586, 595 (Tex. 2018) and *XOG Operating, LLC v. Chesapeake Exploration LP*, 554 S.W.3d 607 (Tex. 2018). The *Endeavor* lease involved a vertical well, not a horizontal well, and the clause provided as follows:

> lease shall automatically terminate as to all lands and depths covered herein, save and except those lands and depths located within a governmental proration unit assigned to a well producing oil or gas in paying quantities and the depths down to and including one hundred feet (100') below the deepest productive perforation(s), with each such governmental proration unit to contain the number of acres required to comply with the applicable rules and regulations of the [RRC] for obtaining the maximum producing allowable for the particular well.

*Endeavor*, 554 S.W.3d at 600. Unlike here, the *Endeavor* parties argued the clause was ambiguous because it did not specify who was responsible for "assigning" the acreage to the proration unit and the maximum allowables under the provision. *Id.* The court concluded the language unambiguously referred to the lessee's assignment of acreage to proration units through its regulatory filings. *Id.* at 603. The court also rejected Endeavor's argument that it was entitled to

assign 160 acres per well under the leases, noting the clause's plain language made clear the central question was how many acres it assigned to a proration unit—80 acres—and the fact that the rules permitted 80-acre proration units. *See Id.* at 605.

Vermillion argues *Endeavor* involved the number of acres required to comply with the applicable RRC rules and regulations for obtaining maximum production allowables for a particular well, implying a well may not be larger than what it produces in production allowables. The Supreme Court has explained that a retained-acreage clause "must be construed on its own, under governing principles of contract interpretation." *Id.* at 597. The clause here and the clause in *Endeavor* are almost nothing alike. As the Supreme Court stated plainly, the controlling issue in *Endeavor* was the number of acres assigned by the operator to the proration units, not whether the acreage complied with specific production allowables. *Id.* at 605. By contrast, the issue here with respect to the well-tract provision is whether 1776 Energy assigned acreage to the horizontal well consistent with the RRC field rules as required by section 6.A. The field rules state the proration unit may include 80 acres as well as any additional acreage provided for in Rule 86 in connection with lateral displacement. A party complying with the field rules' plain language does not "over-assign" acreage simply by not meeting its production allowables. *Id.* at 602.

Like *Endeavor*, *XOG* also involved a vertical well, not a horizontal well. XOG, the lessee, assigned its rights under several leases to assignee, Chesapeake. *XOG*, 554 S.W.3d at 609. At issue was whether any property associated with the leases and its existing six wells, reverted back to XOG. *Id.* at 612. The retained-acreage clause provided, in pertinent part:

> "[P]roration unit" . . . shall mean the area within the surface boundaries of the proration unit then established or prescribed by field rules or special order of the appropriate regulatory authority for the reservoir in which each well is completed. In the absence of such field rules or special order, each proration unit shall be deemed to be 320 acres of land in the form of a square as near as practicable surrounding[ ] a well completed as a gas well producing or capable of production in paying quantities . . . .

*Id.* (second alteration in original).

The court explained that the plain language of the provision provided Chesapeake would retain for each well the acreage included within the proration unit as prescribed by field rules or, in the absence of field rules, 320 acres. Comparing *Endeavor* with *XOG*, the court explained *Endeavor* held "'a governmental proration unit assigned to a well' refers to acreage assigned by the operator, not by field rules." *Id.* at 608-09. In *XOG*, "acreage 'included within the proration unit for each well . . . prescribed by field rules' refers to acreage set by the field rules, not acreage assigned by the operator." *Id.* at 609 (alteration in original). The field rules in *XOG* prescribed 320-acre proration units. Based on the plain language, the court concluded that six 320-acre proration units would therefore be proper, and no property should revert back to Chesapeake. *Id.* at 612.

1776 Energy argues the term maximum allowable production means it may retain as much acreage as local field rules allow. The Supreme Court expressly rejected this interpretation of maximum allowables and RRC rules in *Endeavor*. *See Endeavor*, 554 S.W.3d at 601 ("But Endeavor contends that it retained rights to proration units of 160 acres for each well because the Commission rules allow for a maximum total of 160 acres including the tolerance acres, and that is the amount of acreage that would result in the 'maximum' allowable under the Commission's rules. Like the trial court and the court of appeals, we disagree."). 1776 Energy's position is also inconsistent with the RRC rules' conservation purpose. *See XOG*, 554 S.W.3d at 612 ("One means the Commission uses to *prevent waste and promote conservation* and development is by setting a proration unit for each well to determine its maximum allowable production." (emphasis added)); *Endeavor*, 554 S.W.3d at 596 (providing production allowables are "'the maximum amount of hydrocarbons a well may recover as prescribed by the applicable field rules' and 'are designed to

*limit* production from a well in order to control the rate of production from the field.'" (emphasis added)).

### 3. Section 12 of the Lease

1776 Energy argues section 12's "notwithstanding" provision supports its reading of 320 acres because it expands the well tract by definition to include any wells prescribed or permitted by the RRC and the acreage prescribed by the RRC to allow for maximum production. Section 12 ("Continuous Development") is a special limitations provision, which provides a "lease will automatically terminate upon the happening of a stipulated event. This event may be the cessation of production in contravention of the lease's terms." *Endeavor*, 554 S.W.3d at 606. Section 12's first part explains the "lease shall terminate as to any portion of the Leased Premises located outside of the surface boundaries of any Well Tract and as to all depths . . . on which is located a well producing from a zone or zones included in such Well Tract" for vertical wells. The provision then defines well tract and provides the terms by which it will and will not terminate the lease as to acreage pertaining to the wells. The following paragraph—the notwithstanding paragraph— explains the special limitation addressing vertical wells applies to *horizontal* wells producing oil and/or gas and acreage included with such wells based on tract size calculations under the RRC rules. Section 12's reference to horizontal wells is therefore related to explaining how the lease was specially limited, not how to *measure* acreage for a well tract. Furthermore, 1776 Energy's reading to the contrary would render section 6.A.'s well tract definition meaningless rather than harmonize the two paragraphs, violating contract interpretation principles. *See Anadarko*, 94 S.W.3d at 554.[14]

---

[14] 1776 Energy also argues Vermillion's calculation as to actual production is nonsensical in light of modern horizontal drilling practices. Because we conclude the plain language of the well-tract provision provides for 280 acres, we need not reach this issue. TEX. R. APP. P. 47.1.

Because we conclude a plain reading of section 6.A. provided for the Byrd Ranch No. 1H Well to retain 280 acres rather than 320 acres, we therefore reverse the trial court's summary judgment as to this claim and remand it for further proceedings consistent with this opinion.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT ON OPTION FEE AND RELEASE

Vermillion argued it was entitled to summary judgment on traditional grounds with respect to damages under the lease's $2,300 per net mineral acre option fee because (1) with respect to acreage outside the well tract, 1776 Energy failed to timely release acreage under the lease until 2015—nearly two years after the release was due in 2013; and (2) 1776 Energy erroneously designated more than 40 acres as the well tract.[15] After the parties filed cross-motions for summary judgment on Vermillion's option fee and release claim, the trial court granted 1776 Energy's motion.

In its motion for summary judgment, 1776 Energy argued the lease's express terms automatically released, by operation of contract, any acreage in excess of the well tract's 320 acres at the end of the primary term because 1776 Energy failed to pay the option fee as to those acres. In other words, 1776 Energy had the option to pay the fee and simply declined to exercise that option. 1776 Energy also argued it properly designated 320 acres and therefore none of that acreage was subject to the fee.

Section 2 contains two parts: 2.A.—the "primary term" through 2013—and 2.B.—the "extension of the primary term." Section 2.B. provides:

> **2.B. <u>Extension of Primary Term.</u>** If, Lessee wishes to extend the Primary Term of this lease for an additional two (2) years from the date of its expiration on July 20, 2013 at 5:00 P.M. (central standard time), Lessee shall on or before 5:00 PM

---

[15] Separately, it argues it was entitled to $200 per day under Section 18 for 1776 Energy's failure to timely provide the partial release within 90 days of the lease's expiration as to any released acreage. Vermillion did not raise this ground before the trial court, and it may not be considered on appeal as a ground for reversal. TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *see, e.g.*, *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014).

> on July 20, 2013 deliver to Lessor the sum of Two Thousand Three Hundred Dollars and No/100 ($2,300.00) dollars per net mineral acre of Lessor, not then held by production as set forth in [section] 6 (WELL TRACT) of this Lease, which shall extend the Primary Term of any non-productive acreage until July 20, 2015 at 5:00 P.M. Failure to pay the extension funds shall terminate this lease as to all acreage not then a part of a Well Tract as defined in [section] 6.

The first sentence establishes that a primary term extension is for two years, from July 20, 2013 through July 20, 2015, at a cost of $2,300 per net mineral acre for each acre not subject to the well tract as set forth in section 6. The second sentence establishes that the failure to pay such funds terminates the lease as to all acreage not a part of the well tract as defined in section 6. In other words, the second sentence establishes that if no payment is made, then the lease simply terminates by operation of contract as to acreage outside the well tract.

Vermillion argues 1776 Energy failed to provide a release pursuant to section 10, and the lease was therefore extended under section 2.B. as a result. We disagree. Section 10 provides:

> **10. <u>Release</u>**. In the event this Lease expires for any reason as to all or any portion of the land described in this Lease, Lessee and/or its assigns shall be obligated to furnish Lessor with a written, recordable release instrument covering all, or that portion, of said land within ninety (90) days of such expiration.

Section 10 plainly states if the lease expires with respect to any acreage, 1776 Energy is required to provide a release to Vermillion *within 90 days of the expiration*. By contrast, section 2.B. is clear: if 1776 Energy wants to *extend* the primary term as to any acreage subject to a well tract, 1776 Energy is required to *deliver funds by a specific date:* July 20, 2013. Section 2.B. does not reference section 10, and nothing in Section 2.B. otherwise suggests any decision to decline extending the primary term as to acreage outside the well tract required any affirmative action by 1776 Energy without reading terms into section 2.B. not provided by the plain language. *See Anadarko*, 94 S.W.3d at 554.

However, because we have concluded 1776 Energy improperly included an additional 40 acres as a part of the well tract and those 40 acres therefore would not be "a part of the Well Tract

as defined in [section] 6" under section 2.B., those additional 40 acres also automatically terminated at the end of the primary term because of 1776 Energy's failure to pay the option fee. Because 1776 Energy argues it was entitled to all 320 acres, it never provided a release as to the 40 acres, which would plainly breach Section 10. Vermillion may therefore be damaged as a result of 1776 Energy's failure to provide the release as to those 40 acres.

For these reasons, we affirm in part and reverse in part the trial court's summary judgment for 1776 Energy. We affirm summary judgment for 1776 Energy with respect to acreage outside the well tract; we reverse the trial court's summary judgment with respect to the 40 acres improperly included as a part of the well tract for which 1776 Energy never provided a release; and we remand the case to the trial court for further proceedings, and specifically to determine what damages, if any, Vermillion incurred for the breach of section 10 with respect to the 40 acres.

## CONCLUSION

We affirm in part and reverse in part the trial court's judgment. We affirm summary judgment for 1776 Energy on the untimely well-tract designation claim under section 6.B. and as to the partial release claim. We reverse the trial court's summary judgment for 1776 Energy on the well tract claim under section 6.A., concluding 1776 Energy was entitled to 280 acres, not 320 acres. We affirm in part and reverse in part the trial court's summary judgment for 1776 Energy on the option fee and release, affirming as to acreage outside the well tract, and reversing as to the 40 acres not properly included in the well tract that 1776 Energy did not properly release under section 10. We remand to the trial court for further proceedings to determine what damages, if any, Vermillion is entitled to for 1776 Energy's breach of sections 6.A. and 10.

Luz Elena D. Chapa, Justice