2026 Tex. Bus. 14

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
3/27/2026



## THE BUSINESS COURT OF TEXAS
### FOURTH DIVISION

ROBERT S. MAY, FOXBOROUGH ENERGY COMPANY, LLC, WEST GEORGE PROSPECT, LLC, STEVEN C. HOWARD, METEOR ENERGY, LLC, ALAMO BEACH LIMITED PARTNERSHIP, ALLEN 4A PROPERTIES, LLC, BARRY SWITZER FAMILY, L.L.C., PATRICIA A. BEAN, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF JOE C. BEAN, DECEASED, JOEL G. BEAN, COMMONWEALTH INVESTMENT CORPORATION, PATRICIA MARIE FERMAN, FREDERICK E. GRABOYES, HANNA JOYCE HODGE, ERIC T. HOLMES, HUNTER MILLER FAMILY, L.L.C., J & P FAMILY PROPERTIES, LTD, GLENN C. JENKINS & VIVAN S. JENKINS, JREY PROPERTIES, LLC, LARA ENERGY, INC., NEUHAUS BROOKS INVESTMENTS, LLC, OLD LIPAN LIMITED, OMAR E. ORTEGA, OWLAW REAL ESTATE HOLDINGS, LLC, RRJ ENERGY, LLC, JERRY S. STOKES, WESTENERGY, LLC, DALE M. WILCOX, TRUSTEE OF THE WILCOX MARITAL BYPASS TRUST, JANE A. WHITE, JAMES V. WILLIS & CHARLENE M. WILLIS, and WORSHAM ENERGY HOLDINGS, LLC,

    *Plaintiffs*

v.

INEOS USA OIL & GAS LLC, CHESAPEAKE EXPLORATION, LLC, CHESAPEAKE OPERATING, INC., CNOOC ENERGY USA LLC, LARCHMONT RESOURCES, L.L.C., and GREG WINKLER, INDEPENDENT

Cause No. 25-BC04B-0007

EXECUTOR OF THE ESTATE OF MARK A. §
DOPPS, DECEASED, §
     *Defendants* §

## MEMORANDUM OPINION AND ORDER

¶1     Before the court is Defendants' Motion for Partial Summary Judgment under Rule 166a(c), Plaintiffs' response, Defendants' reply, Defendants' Objections to Plaintiffs' Summary Judgment Evidence, and Plaintiffs' Response to Defendants' Objections. The parties presented their arguments at a hearing before the court on February 24, 2026. Having considered these filings, the parties' argument, and the relevant law, the court partially grants and partially denies Defendants' Motion as follows for the reasons set forth below.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     This case arises from a farmout agreement of oil and gas leases on the Eagle Ford Shale in McMullen County, Texas. All parties agree the dispute centers on their 2009 contracts (collectively "the Contracts"): (1) the Farmout Agreement ("the Agreement"); and (2) the corresponding partial assignment each Plaintiff executed to the Defendants ("the Assignment").

¶3     **The Leases' Assignment and Reversion:** The Agreement requires Plaintiffs–Farmors[1] to assign the two leases ("the Leases") to Defendants–Farmees, which

---

[1] This Opinion, like the parties' briefing, generally refers to the Farmors or Grantors as *Plaintiffs* and to the Farmees or Grantees as *Defendants*, although parties to this suit may be the successors in interest to the 2009 Contracts.

2

Plaintiffs undisputedly did. Agreement § 2; Resp. at 1. The Assignments conveyed each Plaintiff's respective interest in the Leases to Defendants, with Plaintiffs reserving a reversionary interest in the Leases except for assets Defendants "earned" following their drilling activities:

> Further, Grantor reserves for itself, its successors and assigns, a reversionary interest in and to all of the Assets herein assigned to Grantor except for those Assets earned by Grantee upon the drilling of Earning Wells to Earned Depths, such reversion to occur upon the cessation of continuous drilling operations as contemplated by the Farmout Agreement.

Assignment at 23; *see* Agreement § 7.1 (describing the Assignment's "automatic reversion of the Farmout Acreage except for the Earned Acreage upon cessation of continuous drilling operations by Farmee").

¶4        **Earned Assets:** The Agreement specified that a well "shall be declared an 'Earning Well' at such time as said well has been drilled to the" specified depth. Agreement § 5. Prior to drilling an "Earning Well," the Contracts required Defendants to "provide a legal description" of the Earned Acreage "to be designated" for that well. Agreement § 5. Upon drilling of an Earning Well, Defendants may earn "Earned Acreage as to each Earning Well." *Id.* § 1. Then, within 30 days of that Earning Well's completion, they were to file in the deed records a "designation of record" specifying the Earned Acreage. *Id.*; Assignment at 23–24. If Defendants failed to file the designation, after 30 days' notice of the failure a farmor could "at its election" file a notice as to the acreage earned. Assignment at 24.

3

¶5        **Plaintiffs' Reservations and Back-In Interest:** The Plaintiffs also reserved an overriding royalty interest, a 25% interest in Defendants' ownership of the initial test well, and a 30% reversionary back-in interest in Defendants' ownership of their earned assets. The back-in interest would be effective upon "Payout," which was defined as a certain moment in time: 7:00 a.m. on the first day after Defendants recouped specified costs, as outlined in the Agreement. Assignment at 22–23; Agreement §§ 8.1–8.4. The Contracts required Defendants, within 60 days of Payout, to file a declaration that the reversionary back-in had occurred. *Id.;* Agreement § 5. Again, if Defendants failed to do so, a farmor could opt to file its own declaration, which would provide notice to third parties of the back-in interest. Assignment at 24.

¶6        **Issues for Summary Judgment:** The parties disagree as to whether Defendants complied with the above designation requirements, but that question is not presented to the court at this stage. By their Motion, Defendants ask the court to rule as a matter of law as to: (1) whether the Contracts conveyed the Leases upfront or merely granted the right to earn property; (2) which event(s) can trigger the Leases' termination; (3) whether Defendants' contractual obligations for earning acreage are covenants or conditions; and (4) the method for calculation of Payout, which is the event that triggers Plaintiffs' reversionary back-in interest.

¶7     "A party that moves for traditional summary judgment must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022); *see* TEX. R. CIV. P. 166a. The court takes as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *First Sabrepoint Cap. Mgmt., L.P. v. Farmland Partners Inc.*, 712 S.W.3d 75, 84 (Tex. 2025). In cases turning on contract interpretation, a movant seeking summary judgment bears the burden to conclusively establish the correct interpretation of the contract as a matter of law. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157–58 (Tex. 2003). When the contract is unambiguous, its construction is a question of law appropriate for summary judgment, but if the contract is ambiguous, summary judgment is improper. *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017). If the movant meets its initial burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, 663 S.W.3d 569, 584–85 (Tex. 2023).

¶8     "An oil and gas lease is a contract, so its construction is governed by "general principles that govern . . . construction of contracts." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). The most important consideration in interpreting a lease is the agreement's plain, grammatical language.

5

*Id.* In doing so, we "examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent." *Id.* A court's task "is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *Id.*

## ANALYSIS

### A. The Relevant Property Interests under Texas Law

¶9 **1. Lease Owner's Fee Simple Determinable:** "In Texas it has long been recognized that an oil and gas lease is not a 'lease' in the traditional sense of a lease of the surface of real property." *Nat'l Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). "In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Id.* "Consequently, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor." *Id.* "The lessee's/grantee's interest is 'determinable' because it may terminate and revert entirely to the lessor/grantor upon the occurrence of events that the lease specifies will cause termination of the estate." *Id.*

¶10 **2. Lessor's Possibility of Reverter:** "A possibility of reverter is the interest left in a grantor after the grant of a fee simple determinable." *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 480 (Tex. 2017). "The possibility of reverter, though not presently possessory, is presently vested at the time the lease is executed." *Id.*

6

¶11 **3. Lease Owner's Farmout Assignment to Farmee:** "A farmout agreement is an assignment by a lease owner of all or a portion of the lease to another operator who desires to drill on the tract." *ExxonMobil Corp. v. Valence Op. Co.*, 174 S.W.3d 303, 313 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). The farmout may be in the form of either (1) an agreement to transfer or (2) a conditional assignment. *Id.* "The difference stems from the time when the farmee acquires an interest in the farmed-out property." *Eland Energy, Inc. v. Rowden Oil & Gas, Inc.*, 914 S.W.2d 179, 182 n.2 (Tex. App.—San Antonio 1995, writ denied). "In an agreement to transfer, 'the farmee obtains its rights after it performs the prerequisite conditions' set out in the agreement, whereas, 'in a conditional assignment, the farmee acquires its interest in the property when the agreement is made, and is required to reconvey its interest only if its obligations under the agreement are not performed.'" *Valence*, 174 S.W.3d at 313 (quoting *Eland*, 914 S.W.2d at 182 n.2).

**B. Defendants possessed vested interest in the Leases upon the Contracts' execution.**

¶12 The parties disagree on whether and when the Defendants' interest in the Leases vested and on whether Defendants' alleged failure to properly designate the earned assets would automatically trigger reversion of the Lease to Plaintiffs. Defendants correctly maintain that their interest transferred, and vested, immediately upon execution. But Plaintiffs are correct that the assignment was conditional, subject to divestment.

¶13 When a farmout agreement requires compliance with conditions before the

7

assignment occurs, the farmout is an "agreement to transfer," such that the farmee obtains its rights **after** performing the prerequisite conditions. *E.g. Valence*, 174 S.W.3d at 313 (holding farmout was an agreement to transfer where contract required "upon [farmee's] compliance with all conditions . . . and completion of a well [that] ExxonMobil would assign" its interests to farmee); *Eland Energy, Inc.*, 914 S.W.2d at 182 n.2 (holding farmout was an agreement to transfer where farmor "would assign" acreage once farmee completed a producing well); *see Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019) (explaining parties characterized their farmout "as a drill-to-earn farmout"). A conditional assignment, in contrast, is created when the contract assigns the interest to the farmee immediately, but subject to later divestment. *See Valence*, 174 S.W.3d at 313; *Eland Energy, Inc.*, 914 S.W.2d at 182 n.2.

¶14        Here, the parties executed a conditional assignment rather than an agreement to transfer. The parties agreed that "[c]ontemporaneously herewith, each of Farmors has executed and delivered to Farmee a partial assignment . . . [of] (ii) Farmor's Percentage Ownership in and to the balance of the Farmout Acreage." Agreement § 7.1. The Assignment accomplishes this upfront conveyance, declaring that each grantor "does hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER, and DELIVER . . . the following real and personal property," which included each Plaintiff's share of the Leases and the nonexclusive right to use and occupy the surface and certain depths for the purposes of operating and drilling-

8

related development. Assignment at 20; Agreement § 2. The assignment was "effective as of 7:00 a.m. local time" on a date certain in 2009. Assignment at 24. And the Contracts' carveout for "Assets earned" was expressly drafted as an exception to Plaintiffs' reversionary interest—not an exception to Defendants' lease assignment. Assignment at 23 (reserving Plaintiffs' reversionary interest to all Assets . . . "except for those Assets earned by Grantee . . .").

¶15    Upon execution of the Contracts, then, Plaintiffs had assigned the Leases while reserving the above-described reversionary interests. This resulted in Defendants' receipt of a fee simple determinable. *See El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013) ("A possibility of reverter is a term of art for a future interest retained by a grantor that conveys a determinable fee.") (internal quotations omitted). Immediately upon assignment, Defendants held an "immediate, fixed right of present or future enjoyment of the interest[s]" conveyed. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 867 (Tex. 2018) (defining *vest* in context of common-law rule against perpetuities). A typical reversionary interest, though "not presently possessory, is presently vested at the time [an oil and gas] lease is executed," and no less can be said of Defendants' presently possessory interest in the Leases. *See Laddex*, 513 S.W.3d at 480.

¶16    Plaintiffs' briefing emphasizes that the Assignment was made "subject to" specified conditions and to their reversionary interest, but their ownership of a possibility of reverter does not somehow divest Defendants of their fee simple

determinable. Plaintiffs cite no case law that prevented the vesting of Defendants' title upon the Assignments' execution. Under the Contracts' plain terms, Defendants were assigned an immediate, vested interest in their fee simple determinable.

## C. Only cessation of continuous drilling operations would trigger reversion.

¶17 Defendants argue that under the Contracts, "the only event that can cause a termination and reversion of undrilled acreage is the cessation of continuous drilling operations[.]" Mot. at 4. Other than forfeiture for failing to timely commence or complete a well, which Plaintiffs have not invoked in this suit, Defendants are correct. Under the Contracts' plain terms, reversion to Plaintiffs occurs only "upon cessation of continuous drilling operations by Farmee." Agreement § 7.1; Assignment at 23 ("such reversion to occur upon the cessation of continuous drilling operations"). The Contracts identify no other event—including an alleged failure to properly designate earned wells or acreage—that triggers the Leases' reversion to Plaintiffs. Until cessation, Defendants are not divested of their fee simple determinable in the Leases—and Plaintiffs maintain their nonpossessory possibility of reverter in any assets that Defendants do not earn.

## D. Upon reversion, Defendants retain only the Earned Assets—which is a special limitation, not a forfeiture.

¶18 The parties disagree on whether the earned-assets requirements in the Contracts are covenants or conditions, with Defendants urging that a failure to

complete what Plaintiffs describe as "Earning Barriers" cannot result in forfeiture of their interests. Plaintiffs, in turn, claim that enforcing the Earning Barriers is not a forfeiture at all.

¶19    The parties' Contracts contained retained-acreage clauses, which can "come in many different shapes, sizes, and forms." *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 598 (Tex. 2018). "The effect of a particular retained-acreage clause depends on the terms the parties freely chose" and the "clause must be construed on its own, under governing principles of contract interpretation." *Id.* "Although originally drafted to prevent the lessee from losing those portions of a lease that had productive wells located thereon if the rest of the lease terminated, retained-acreage clauses have expanded to include clauses that require the release of all acreage that, at the end of the primary term, is not within a drilling, spacing, or proration unit." *Id.* (internal quotations omitted).

¶20    The parties focus on the distinction between conditions and covenants, which "lies in the appropriate remedy for their breach." *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989). Breach of a condition results in automatic termination of the leasehold estate upon the happening of stipulated events, *id.*, prompting forfeiture of the interest, *Endeavor*, 554 S.W.3d at 606 n.14. Breach of a covenant does not automatically terminate the estate; it instead subjects the breaching party to liability for monetary damages or, in extraordinary circumstances, the remedy of a conditional decree of cancellation. *Rogers*, 772 S.W.2d at 79. A special limitation,

11

though, can be distinguished from both. It is true that both a special limitation and a condition call for the lease to terminate. *See Cromwell v. Anadarko E&P Onshore, LLC*, 716 S.W.3d 515, 524 (Tex. 2025) (internal quotations omitted) ("A special limitation in an oil-and-gas lease is a term that provides that the lease will automatically terminate upon the happening of a stipulated event.") Unlike a condition, though, "a special limitation does not operate to cut short the estate but simply fixes one of the natural limits of the estate beyond which the estate cannot endure[.]" *Endeavor*, 554 S.W.3d at 606 n.14.

¶21    Just as doubts should be resolved against imposing a condition, a "retained-acreage provision can impose a special limitation on a general grant of a mineral interest only if the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *XOG Operating, LLC v. Chesapeake Expl. Ltd. P'ship*, 554 S.W.3d 607, 612 (Tex. 2018) (internal quotations omitted); *Endeavor*, 554 S.W.3d at 606; *see Rogers*, 772 S.W.2d at 79; *Cromwell*, 716 S.W.3d at 523–24 (construing habendum clause in oil and gas lease against finding a special limitation, noting that "doubts should be resolved" against automatic termination). But when a lease specifies that it will automatically terminate except as to retained acreage, that language "operate[s] as special limitations on the [lessee's] leasehold interests." *Endeavor*, 554 S.W.3d at 606. Construing a retained-acreage clause to terminate as to the unearned acreage "does not result in forfeiture, but rather a partial termination of the leases under their own terms." *Id.*

12

¶22     In *Endeavor,* if the lessee "did not assign the undeveloped acreage to a proration unit, [its] leases automatically terminated as to those lands." *Id.* at 607. There, to prevent automatic termination, the lessee was required to "assign sufficient acreage" by the end of the continuous-development period. *Id.* at 600 ("lease shall automatically terminate as to all lands and depths covered herein, save and except those lands and depths located within a governmental proration unit assigned to a well producing oil or gas in paying quantities . . . ."); *id.* at 606–07 (holding "the leases required Endeavor to either (1) continue developing . . . or (2) by the end of the continuous-development period, assign sufficient acreage . . . .").

¶23     As in *Endeavor,* "at the clause's triggering event," which in this case is cessation of continuous drilling operations, Defendants' interest in the Leases will terminate as to all property not retained (or "earned") according to the parties' agreement. *See Endeavor,* 554 S.W.3d at 600–05. At that point, reversion of the unearned property interest is "automatic." *See* Agreement § 7.1. Like the retained-acreage language in *Endeavor,* the Contracts' retained-acreage terms are "precisely the type of clear and unequivocal language that imposes a special limitation on a lease." 554 S.W.3d at 606.

¶24     Here, the parties' Agreement also has a "forfeiture" clause, along with several covenants that obligate Defendants to act without altering the scope of Plaintiffs' possibility of reverter. *Compare* Agreement § 17 ("Default" section providing for "automatic forfeiture of all of Farmee's rights under this Agreement"

13

upon failure to timely commence or complete well) *with id.* §§ 14.3, 15, 16 (independently requiring that Farmee "shall" provide monthly Payout statements, carry insurance, and comply with laws and regulations). The Contracts confirm that the parties knew how to draft a forfeiture condition for the Leases, so "the dissimilar language" of the other clauses "indicates that the parties intended the latter paragraph[s] to act as a covenant." *Rogers*, 772 S.W.2d at 79 (holding that where provision for reversion of leased property used clear conditional language, a separate provision requiring performance of lease obligations was a covenant that could not divest assignee of title). But the retained-acreage clauses are distinct from the Contracts' forfeiture conditions and from those covenants.

¶25     Upon cessation of continuous drilling operations, the Leases automatically revert to Plaintiffs, **except for the earned assets**. Agreement § 7.1; Assignment at 23. The court holds that the earned-asset provisions operate as a special limitation as to any assets Defendants fail to earn by the end of the continuous-drilling-operations period. *See Endeavor*, 554 S.W.3d at 606. But at this stage the parties have not asked the court to adjudicate which assets, if any, Defendants earned, including: (1) which contractual requirements Defendants satisfied as to any specific earned assets; (2) when Defendants satisfied any such requirements; (3) whether time was of the essence as to any deficiencies; or (4) whether cessation of continuous drilling operations occurred before those requirements were satisfied. Absent development in the record regarding any allegedly earned assets, the court declines to opine as to

14

which specific events could theoretically affect the scope of the Contracts' special limitation against Defendants' interest in the Leases.

**E. Payout triggers Plaintiffs' reversionary back-in interest based on each Earning Well, not based on any well.**

¶26 When assigning the Leases, Plaintiffs reserved a reversionary "back-in" interest in certain of the Defendants' earned assets. Agreement § 8.3; Assignment at 23. Plaintiffs correctly explain that they "earn their 30% reversionary interest in the identified three components upon Payout of a single Earning Well: 'effective as of Payout for such Earning Well.'" Resp. at 6. Those three components of Plaintiffs' back-in interest are: (1) the Earning Well, (2) the Earned Acreage for such Earning Well, and (3) any other Wells drilled on the Earned Acreage. *Id.* The parties also agree that the Agreement expressly defines "Payout" in Section 8.4. Payout:

> shall occur as to the Initial Test Well and any other Earning Well at 7:00 a.m. on the first day following the day on which Farmee recovers out of its share of production from such Earning Well (and any other well located on the lands covered by the Earned Acreage for such Earning Well), after deduction of all royalties . . . , production or severance taxes, and any other burden or tax measured by or payable out of production, an amount equal to the sum of (i) the aggregate costs and expenses incurred by Farmee relating to the drilling . . . such well or wells to first sales, . . . , (ii) any gathering or processing costs . . . , and (iii) any other costs attributable to the interest of Farmee related to the operation of such well(s) during such payout period.

Agreement § 8.4.

¶27 Plaintiffs argue that Payout is "well by well"—that Payout would first occur as to an Earning Well and then could later occur as to a nearby non-earning well on

15

the same Earned Acreage. Their interpretation defies the Contracts' plain terms, which repeatedly state that Payout occurs as to an "Earning Well." Agreement § 8.3 (reversionary back-in is effective "as of Payout for such Earning Well"); *id.* § 8.4 (Payout shall occur as to the Initial Test Well "and any other Earning Well"); Assignment at 23 (specifying the 30% interest is "effective as of Payout for such Earning Well"). And an Earning Well is expressly distinguished from other lowercase "wells" on the Earning Well's acreage. Any well "shall be declared an 'Earning Well' at such time as said well has been drilled to the" specified depth. Agreement § 5. Upon drilling of an Earning Well, Defendants may earn "Earned Acreage as to each Earning Well." *Id.* § 1. But "a well drilled on acreage that has already been earned **shall not be an Earning Well**." *Id.* § 5 (emphasis added). Any later-drilled well on Earned Acreage is not an Earning Well and cannot trigger Payout under the Contracts.

¶28    Plaintiffs point to the Agreement's recitals, which use the term "well by well." Agreement at A. But a contract's recitals do not control the operative clauses of a contract unless those clauses are ambiguous. *Kartsotis v. Bloch*, 503 S.W.3d 506, 518 (Tex. App.—Dallas 2016, pet. denied); *Savering v. City of Mansfield*, 505 S.W.3d 33, 42 n.5 (Tex. App.—Fort Worth 2016, pet. denied). Regardless, the recital cited by Plaintiffs is one that describes amendments to a previous farmout agreement, altering a prior reversionary back-in interest from a "project payout" to a "well by well" payout. Agreement at A. The recital does not seek to define the

16

method or scope for defining how payout for a "Earning Well by Earning Well" calculation should occur. Sections 8.3 and 8.4 of the Agreement serve that purpose, and they define the method and scope unambiguously. The court's analysis must hinge on the defined term "Payout," as that process is detailed in the contract, rather than on an undefined, shorthand phrase referenced in a recital.

¶29     The Contracts' Payout structure confirms that a nonearning well cannot trigger Payout, given the three components Plaintiffs gain from each Payout. If Plaintiffs were to receive a 30% interest in (i) the Earning Well, (ii) Earning Acreage for the Earning Well, and (iii) any other wells on that Acreage every time any "Earning Well" and again every time "any other well" reaches a payout, Plaintiffs would accumulate 30% of the same wells and acreage multiple times over. Instead, Payout can expressly occur only as to each Earning Well, which then grants Plaintiffs their 30% interest in **all three components** relating to that Earning Well—and that back-in interest will only revert to Plaintiffs a single time as to each Earning Well. Because Payout must be calculated on an "Earning Well by Earning Well" basis, Payout occurs at 7:00 a.m. following the day Defendants recover their contractually specified costs relating to the Earning Well **and** its corresponding Earned Acreage— including those costs as to other nonearning wells on the Earned Acreage—precisely as the Agreement's Section 8.4 says. That clause's reference to the aggregate costs of the singular "well" or plural "wells" confirms what the remaining text describes: costs are cumulative between all wells, while Payout will be a singular event as to

17

only "the Earning Well."

### F. The contractual terms are conclusive without resort to extrinsic evidence.

¶30 Defendants move to strike Plaintiffs' evidence that is extrinsic to the Contracts.

¶31 "Unambiguous contracts must be enforced as written without considering extrinsic evidence bearing on the parties' subjective intent." *Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023). However, "when contractual text alone is inconclusive, courts may consider the facts and circumstances surrounding the contract, including the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (internal brackets and quotations omitted).

¶32 While Plaintiffs' arguments largely focus on overcoming hearsay objections, the deficiency in their exhibits is more fundamental. Plaintiffs urge the court to consider how the Defendants interpreted and performed on the Contracts, and they concede their evidence reveals "the parties' course of performance after execution." Of course, "courts can't consider course-of-performance evidence to interpret an unambiguous contract." *Equinor Energy LP v. Lindale Pipeline, LLC*, No. 24-0425, 2026 WL 705761, at *4 (Tex. Mar. 13, 2026).

¶33 Plaintiffs themselves describe their exhibits as "[p]ost-execution evidence"— which could not possibly supply "context" for past circumstances that would have

18

existed during a 2009 transaction. Further, "[b]ecause objective intent controls the inquiry, only circumstantial evidence that is objective in nature may be consulted." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 768 (Tex. 2018). Witnesses' statements attempting to interpret the meaning of a contract are not "objectively determinable" circumstances surrounding the contract's execution. Even if the witness is proven to have been an original party to the contract, an opinion as to the contract's meaning is nothing more than subjective evidence that Texas courts are prohibited from considering in this context. *See id.; Devon Energy*, 668 S.W.3d at 343.

¶34    All parties agree their contractual text is unambiguous. As to the discrete issues before the court at this stage of partial summary judgment, the court concludes that the Contracts' terms are conclusive and unambiguous, such that it need not resort to extrinsic evidence to construe them. By separate order, the court sustains Defendants' objections to Exhibits D through K of Plaintiffs' response.

¶35    As described above, the court does not reach the issue of whether any specific alleged acts or omissions by Defendants were within the scope of the special limitation on the Leases. The court overrules Defendants' objections to paragraphs 8–10 of Steven Howard's declaration, which were submitted in an attempt to raise fact issues as to Defendants' satisfaction of their contractual obligations in properly declaring their earned assets, rather than to provide extrinsic evidence to alter the court's contractual construction.

## CONCLUSION AND ORDER

Having considered Defendants' Motion for Partial Summary Judgment and all arguments of counsel, the Court partially GRANTS the Motion as follows and holds that the parties' Contracts are unambiguous with respect to the issues adjudicated in this Order, holding as a matter of law that:

(1) the Contracts conveyed to Defendants a vested fee simple determinable in the Leases as described in this Opinion;

(2) no partial termination or corresponding reversion of Defendants' interest can occur until cessation of continuous drilling operations by Defendants;

(3) the Contracts' earned-acreage provisions operate as special limitations on Defendants' property interest; and

(4) Plaintiffs' 30% reversionary back-in interest is triggered at Payout, which occurs upon and is calculated based on cost recovery for each Earning Well under the process described in the Agreement, which aggregates all specified costs on the corresponding Earned Acreage; Payout cannot occur independently as to a nonearning well.

In any remaining respect other than as expressly granted in this Order, Defendants' Motion is DENIED.

SO ORDERED.

STACY ROGERS SHARP
Judge of the Texas Business Court,
Fourth Division

SIGNED ON: March 27, 2026